**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MANUEL SEPULVEDA,** | : | |
| **Petitioner** | : | **No. 3:06-cv-00731** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **LAUREL HARRY, Acting Secretary,** | : | |
| **Pennsylvania Department of Corrections,** | : | |
| **and MICHAEL ZAKEN, Superintendent** | : | |
| **of the State Correctional Institution at** | : | |
| **Greene,[1]** | : | |
| **Respondents** | : | |

**MEMORANDUM**

This matter is before the Court pursuant to Petitioner Manuel Sepulveda ("Sepulveda")'s

amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Doc. No. 31.)

The § 2254 amended petition is fully briefed and ripe for disposition.

**I.      BACKGROUND**

**A.      Trial and Direct Appeal**

Following a jury trial in the Court of Common Pleas of Monroe County, Sepulveda was

found guilty of two counts of first-degree murder and one count of conspiracy to commit

homicide and sentenced to death for each of the first-degree murder convictions.  <u>See</u>

---

[1]  The Amended Petition for Writ of Habeas Corpus names as respondents John E. Wetzel,
Secretary of the Pennsylvania Department Corrections, and Robert Gilmore, Superintendent of
the State Correctional Institution at Greene.  (Doc. No. 31 ¶¶ 2-3.)  Mr. Wetzel has been
succeeded by Laurel Harry as Acting Secretary of Corrections.  Mr. Gilmore has been succeeded
by Michael Zaken as Superintendent of the State Correctional Institution at Greene.  Pursuant to
Federal Rule of Civil Procedure 25(d), a public officer's successor is automatically substituted as
a party in an action brought against the public officer in an official capacity.

Commonwealth v. Sepulveda, 855 A.2d 783, 785-86 (Pa. 2004) ("Sepulveda I"); (Doc. No.

59-12 at 92-93).[2]  The Pennsylvania Supreme Court summarized the facts as follows:

> [O]n November 26, 2001, [Sepulveda] was at the home of Daniel Heleva
> [("Heleva")] and Robyn Otto [("Otto")] in Polk Township, Monroe County, where
> he resided with the couple and their two children.  At approximately 6:30 p.m.,
> John Mendez [("Mendez")] and Ricardo Lopez [("Lopez")] arrived at the house to
> recover two guns that Mendez claimed belonged to him.  [Sepulveda] retrieved the
> guns from an upstairs bedroom and gave them to Mendez.  Mendez and Lopez then
> left.
>
> Later that night, Heleva returned to the house with Richard Boyko [("Boyko")] and
> discovered that the guns were missing.  After [Sepulveda] explained to Heleva that
> Mendez had taken the guns, Heleva instructed Boyko to call Mendez and have him
> come back to the house.  At this time, another man, Jimmy Frey [("Frey")], was in
> the living room watching television.
>
> Mendez and Lopez returned to the house, but Heleva did not permit Lopez to enter.
> Mendez, however, came inside, where Heleva immediately accused him of stealing
> his guns and the two men began fighting in the kitchen.  When this fight was
> resolved, [Sepulveda] and Lopez joined Heleva and Mendez in the kitchen, where
> the four men then sat around the table talking.  Boyko left the house.  While the
> men were in the kitchen, another argument erupted.  This time, [Sepulveda] grabbed
> a .12 gauge shotgun and shot Mendez in the stomach.  He then turned the gun
> towards Lopez and shot him in the side.  After Lopez collapsed on the floor,
> [Sepulveda] placed the barrel of the shotgun on Lopez's back and again fired the
> weapon, killing him.  [Sepulveda] then chased Mendez up the stairs to the second
> floor of the house, where he shot Mendez a second time.  Although wounded,
> Mendez escaped from [Sepulveda] and Heleva and fled to a neighbor's house with
> [Sepulveda] and Heleva in pursuit.  Mendez knocked on the neighbor's front door,
> but before anyone answered, [Sepulveda] and Heleva grabbed Mendez and dragged
> him across the lawn back to their house.  Frey, who had been watching the incident,
> retrieved the shotgun that [Sepulveda] had dropped on the lawn and hid it inside a

---

[2]  The Pennsylvania Supreme Court decision indicates that Sepulveda was also convicted of two
counts of aggravated assault, criminal conspiracy, unlawful restraint, and tampering with or
fabricating evidence.  See Sepulveda I, 855 A.2d at 785.  Sepulveda's amended petition does not
allege that he was convicted of those charges.  (Doc. No. 31 ¶ 4.)  Based on the Court's review of
the record, it appears that Sepulveda was convicted only of two counts of first-degree murder and
one count of conspiracy to commit homicide and that the other charges were withdrawn before
the case was submitted to the jury.  (Doc. Nos. 59-11 at 108-09, 59-12 at 89-90, 92-93.)

sofa in the house.  Once the men had dragged Mendez back inside, [Sepulveda] inflicted several blows with a hatchet type of weapon, killing him.

Meanwhile, police received a 911 call from Heleva's neighbor reporting a domestic violence dispute at Heleva's home.  In response, Pennsylvania State Troopers Matthew Tretter [("Tretter")] and Joel Rutter [("Rutter")] arrived at the scene and spoke to the neighbor, who told them that she had heard a loud noise and a high-pitched voice screaming "help me" outside of her door and that when she looked outside, she had seen someone being dragged across her front lawn into Heleva's residence.  The troopers noticed that there was a smear of blood on the neighbor's front door and that a wooden porch railing had been broken.  The troopers then proceeded to Heleva's residence.  Along the way, the troopers noticed a bloody jacket on the neighbor's lawn, and they observed blood on Heleva's door when they arrived.  When the troopers knocked on the door and announced their presence, [Sepulveda] opened the door and initially denied knowledge of any incident, but then stated that he had been assaulted by two men.

At this time, Trooper Tretter placed [Sepulveda] in the back of the patrol car, handcuffed him, and, still believing that this was a domestic violence incident, asked [Sepulveda] where the woman was.  [Sepulveda] responded: "There is no 'she.'  They are in the basement.  I shot them."  Trooper Tretter then called for backup.  After additional state troopers arrived on the scene, they entered the residence, set up a perimeter and initiated a crime scene log.  The police found the bodies of Lopez and Mendez in the basement of the residence.

The troopers transported [Sepulveda], along with Heleva, Robyn Otto, and their children, to the Lehighton Barracks.  Boykin and Frey were also rounded up and brought to the station.  Once at the station, Trooper Joseph Sommers [("Sommers")] and Corporal Thomas McAndrew [("McAndrew")] read [Sepulveda] <u>Miranda</u> warnings at approximately 3:45 a.m.  [Sepulveda] signed a rights waiver form, and the troopers began to interview him. After about one hour, at approximately 5:04 a.m., [Sepulveda] began to make a tape-recorded statement.  In this statement, [Sepulveda] admitted that he shot both Mendez and Lopez twice, but claimed that he only started shooting after he believed Lopez was about to go out to his car to retrieve a gun.  [Sepulveda] also admitted that after Mendez ran outside following the shooting, he and Heleva dragged Mendez back inside, at which time [Sepulveda] grabbed the hatchet type weapon and struck Mendez in the head.

After [Sepulveda] made this statement, at approximately 6:00 a.m., the officers took a break from this questioning. Trooper Sommers and Corporal McAndrew conferred with the other investigators involved in the case and returned to [Sepulveda] for further questioning. At approximately 7:10 a.m., [Sepulveda]

indicated that he wished to speak to Corporal McAndrew alone and proceeded to tell the corporal that he had lied in his original statement. [Sepulveda] then gave a statement which again implicated himself in the murders, but in this statement, [Sepulveda] claimed that he had actually only shot Lopez once, in the kitchen. [Sepulveda] stated that he did not shoot Lopez the second time. Although [Sepulveda] also admitted that he shot Mendez a second time, [Sepulveda] claimed that it was Heleva who eventually struck Mendez in the head with the hatchet type weapon, killing him.

[Sepulveda] also testified at his trial, where he again admitted to shooting both Lopez and Mendez. [Sepulveda] told the jury, however, that he had not intended to kill either Lopez or Mendez. In general, [Sepulveda's] testimony described the events as he had recounted them in his second statement to Corporal McAndrew.

See Sepulveda I, 855 A.2d at 786-88 (footnotes and citations omitted).

Sepulveda was represented at trial by Marshall Anders ("Anders") and on appeal by Anders and his associate, Ellen Schurdak ("Schurdak"). (Doc. 31 ¶ 5.) Sepulveda's timely appeal to the Pennsylvania Supreme Court raised the following issues: (1) the evidence was insufficient to support the first-degree murder convictions; and (2) the trial court erred in denying Sepulveda's motion to suppress his statements to Trooper Tretter and Corporal McAndrew. See Sepulveda I, 855 A.2d at 786-93. The supreme court[3] concluded that the claims lacked merit and affirmed Sepulveda's convictions and death sentences. See id. at 793-94. The United States Supreme Court denied certiorari. See Sepulveda v. Pennsylvania, 546 U.S. 1169 (2006).

### B.    Post-Conviction Proceedings

Sepulveda initiated the instant federal habeas proceeding by filing a motion to proceed in forma pauperis and for appointment of counsel. (Doc. No. 1.) The Court granted that motion on April 7, 2006 and appointed as co-counsel the Capital Habeas Units of the Public Defender

---

[3] For the sake of brevity, the Court will at times refer to the Pennsylvania Supreme Court as the "supreme court" and refer to the United States Supreme Court as the "Supreme Court."

Office for the Middle District of Pennsylvania and the Federal Community Defender Office for the Eastern District of Pennsylvania ("FCDO").  (Doc. No. 2.)  Sepulveda filed his habeas petition on December 4, 2006.  (Doc. No. 7.)  On December 6, 2004, the Court entered an order staying the proceedings to permit Sepulveda to exhaust his state remedies.  (Doc. No. 9.)

Sepulveda had already filed a pro se petition under the Pennsylvania Post Conviction Relief Act ("PCRA").  (Doc. No. 59-21.)  Represented by the FCDO, he filed an amended PCRA petition.  (Doc. No. 59-19.)  After holding an evidentiary hearing over the course of four days in April and June 2007, the PCRA court denied relief on all claims.  (Doc. No. 59-37.)

Sepulveda timely appealed the PCRA court's decision to the Pennsylvania Supreme Court, raising the following issues:

1.     Counsel was ineffective in failing to investigate and present mental health evidence to support claims of diminished mental capacity, imperfect defense of others, and mitigating evidence;

2.     Counsel was ineffective in failing to challenge the Commonwealth's peremptory challenges of potential jurors;

3.     Counsel was ineffective in failing to properly question potential jurors who were excused because they expressed doubts about imposing the death penalty;

4.     Counsel was ineffective in challenging Sepulveda's inculpatory statements;

5.     The jury was presented with materially false evidence by the Commonwealth and trial counsel was ineffective for failing to present an expert to dispute this evidence;

6.     Counsel was ineffective in failing to object to victim impact evidence;

7.     Error in the guilt phase jury instructions violated Sepulveda's due process rights;

8.     Counsel had a conflict of interest;

9.     Sepulveda's rights were violated because no transcript exists of portions of his trial; and

10.    The cumulative effect of the alleged errors warranted relief.

5

See Commonwealth v. Sepulveda, 55 A.3d 1108, 1116-17 (Pa. 2012) ("Sepulveda II").  The supreme court affirmed the PCRA court's decision except insofar as the PCRA court had dismissed the claim of ineffective assistance of counsel at the penalty phase.  See id. at 1151. The supreme court concluded that trial counsel performed deficiently by failing to develop and present mitigating evidence in the penalty phase.  See id.  The supreme court did not address whether counsel's deficient performance prejudiced Sepulveda but instead remanded the case to the PCRA court to address that issue.  See id.  The supreme court also directed the PCRA court to address on remand whether federal law authorized the FCDO to represent Sepulveda in the PCRA proceedings.  See id.

The hearing on remand was delayed while the issue of the FCDO's authority to represent Sepulveda was litigated in federal court.  See Commonwealth v. Sepulveda, 144 A.3d 1270, 1274-75 (Pa. 2016) ("Sepulveda III").[4]  On October 3, 2014, Sepulveda filed a pro se PCRA petition based on newly discovered evidence, consisting of an affidavit signed by Otto in which she recounted conversations with the prosecutor before she testified at trial.  See id. at 1275.  On December 3, 2014, Sepulveda filed a pro se motion seeking the removal of counsel and a hearing pursuant to Commonwealth v. Grazier, 713 A.2d 81 (Pa. 1998).  See Sepulveda III, 144 A.3d at 1275.  On February 18, 2015, the PCRA court held a hearing on the Grazier request, at which Sepulveda confirmed his desire to have the FCDO continue to represent him and withdrew his

---

[4]  This issue was ultimately resolved by a Third Circuit Court of Appeals decision holding that federal law preempted any state court proceedings brought to address the FCDO's authority under federal law to represent petitioners in state PCRA proceedings.  See Sepulveda III, 144 A.3d at 1274 n.11 (citing In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila., 790 F.3d 457 (3d Cir. 2015)).

request to proceed <u>pro</u> <u>se</u>.  <u>See</u> <u>id.</u>  The Commonwealth stipulated that the FCDO could represent Sepulveda, and the remand proceedings moved forward.  <u>See</u> <u>id.</u> at 1275 & n.13.

On April 20, 2015, the PCRA court held a hearing to address both the issue of prejudice in the penalty phase and the newly discovered evidence claim.  <u>See</u> <u>id.</u> at 1275-76.  Following that hearing, Sepulveda filed a motion to amend his original PCRA petition to add claims based on the newly discovered evidence of Otto's statements.  On August 14, 2015, the PCRA court issued a decision finding that Sepulveda suffered prejudice at the penalty phase due to counsel's deficient representation and ordering a new sentencing hearing.  <u>See</u> <u>id.</u> at 1277.  The PCRA court also granted Sepulveda's motion to amend his original PCRA petition, but the court found that the newly discovered evidence claims lacked merit and denied relief.  <u>See</u> <u>id.</u>

The Commonwealth did not appeal the PCRA court's decision to grant a new penalty hearing.  <u>See</u> <u>id.</u>  Sepulveda appealed the PCRA court's denial of relief on the newly discovered evidence claims.  <u>See</u> <u>id.</u>  The Pennsylvania Supreme Court vacated the PCRA court's decision because it concluded that the PCRA court exceeded its authority and the scope of the remand order when it permitted Sepulveda to amend his PCRA petition.  <u>See</u> <u>id.</u> at 1280-81.  The Commonwealth elected not to pursue the death penalty a second time.  (Doc. Nos. 31 ¶ 13, 49 at 10.)  On November 29, 2016, Sepulveda was resentenced to two concurrent life terms for the two first-degree murder counts, plus 12 to 24 years imprisonment for conspiracy to commit homicide.  (Doc. No. 31 ¶ 13.)

On November 20, 2017, Sepulveda filed the instant amended habeas petition pursuant to 28 U.S.C. § 2254 (Doc. No. 31), alleging ten claims for relief:

I.  Ineffective assistance of counsel for failure to develop and present evidence to support defenses to the first-degree murder charges;

II.       The Commonwealth's suppression of statements from Robyn Otto violated Sepulveda's right to due process under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963);

III.      The trial court's guilt-phase instructions violated due process, and trial and appellate counsel rendered ineffective assistance in failing to litigate these claims;

IV.      The Commonwealth's presentation of materially false evidence violated Sepulveda's right to due process, and counsel rendered ineffective assistance in failing to discover the misconduct;

V.      Ineffective assistance of counsel for failure to properly challenge the admission and voluntariness of Sepulveda's inculpatory statements;

VI.      The prosecution used peremptory challenges in a discriminatory manner against women and minorities, and counsel rendered ineffective assistance in failing to object;

VII.      Ineffective assistance of counsel due to defense counsel's undisclosed conflict of interest;

VIII.      Ineffective assistance of counsel for failure to object to the admission of improper victim impact evidence at the guilt phase;

IX.      The lack of a transcript of significant portions of the trial was a denial of due process and counsel was ineffective in failing to ask that the complete trial be transcribed; and

X.      The cumulative prejudicial effect of the errors described in the petition denied Sepulveda due process and the effective assistance of counsel.

(Doc. No. 31 at 3-5). Sepulveda filed a supporting memorandum of law on May 7, 2018. (Doc. No. 42.) Respondents filed their response to the amended petition (Doc. No. 48) and a memorandum of law (Doc. No. 49) on August 3, 2018. Sepulveda filed his reply memorandum of law on October 19, 2018. (Doc. No. 54.) The amended petition is therefore ripe for decision.

## II.    STANDARDS OF REVIEW

A federal court may entertain an application for a writ of habeas corpus filed by a person in state custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." <u>See</u> 28 U.S.C. § 2254(a). Federal habeas review "cannot serve

8

as 'a substitute for ordinary error correction through appeal,'" but instead is "'an 'extraordinary remedy' that guards only against 'extreme malfunctions in the state criminal justice systems.'" See Shinn v. Ramirez, 142 S. Ct. 1718, 1731 (2022) (quoting Harrington v. Richter, 562 U.S. 86, 102-03 (2011).  To ensure that federal habeas corpus retains its "narrow role," both the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and decisions of the United States Supreme Court impose strict limitations on a federal court's authority to grant habeas relief.  See Shinn, 142 S. Ct. at 1731.

### A.    Exhaustion and Procedural Default

A state prisoner may not seek federal habeas relief unless he first exhausts the available state remedies.  See 28 U.S.C. § 2254(b)(1)(A).  Exhaustion occurs when the prisoner gives the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).  If a state court would dismiss a claim for a procedural failure, the claim is "technically exhausted" because, in the habeas context, state remedies are "'exhausted' when they are no longer available, regardless of the reason for their unavailability."  See Shinn, 142 S. Ct. at 1732 (quoting Woodford v. Ngo, 548 U.S. 81, 92-93 (2006)).  In that case, the doctrine of procedural default precludes the federal court from considering the claim if the state court refused to hear it "based on an adequate and independent state procedural ground."  See Davila v. Davis, 137 S. Ct. 2058, 2062 (2017).

A state procedural rule is "'independent' if it is not interwoven with federal law or dependent upon a federal constitutional ruling."  See Bey v. Superintendent Greene SCI, 856 F.3d 230, 236 n.18 (3d Cir. 2017) (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)).  A state procedural rule is "'adequate' if it was 'firmly established and regularly followed' at the

time of the alleged procedural default." See id. (quoting Ford v. Georgia, 498 U.S. 411, 424 (1991)). For a federal habeas claim to be barred by procedural default, the state rule must have been announced prior to its application in the petitioner's case. See Fahy v. Horn, 516 F.3d 169, 187 (3d Cir. 2008); Albrecht v. Horn, 485 F.3d 103, 115 (3d Cir. 2007). Even if a rule appears "'in retrospect to form part of a consistent pattern of procedures,'" it is not adequate to bar federal habeas review if the petitioner "could not be 'deemed to have been apprised of its existence.'" See Ford, 498 U.S. at 423 (quoting NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 457 (1958)). The rationale for these requirements is that "a petitioner is entitled to notice of how to present a claim in state court." See Albrecht, 485 F.3d at 115 (citing Ford, 498 U.S. at 423-24). Federal review is not barred "unless a habeas petitioner had fair notice of the need to follow the state procedural rule." See Bronshtein v. Horn, 404 F.3d 700, 707 (3d Cir. 2005).

### B.    Substantive Standard

If a claim presented in a federal habeas petition has been adjudicated on the merits in state court proceedings, relief cannot be granted unless:

> the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

See 28 U.S.C. § 2254(d). This "difficult to meet" and "highly deferential" standard demands that state court decisions "be given the benefit of the doubt." See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations and quotation marks omitted).

A state court decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a

set of materially indistinguishable facts." <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).  A state court decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>See</u> <u>id.</u> at 413.  Section 2254(d)(1) authorizes federal habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." <u>See</u> <u>Harrington</u>, 562 U.S. at 102.

A state court's factual determination is not "unreasonable" under § 2254(d)(2) "merely because the federal habeas court would have reached a different conclusion in the first instance." <u>See</u> <u>Wood v. Allen</u>, 558 U.S. 290, 301 (2010).  A decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>See</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

The highly deferential standard of § 2254(d) applies only to claims that were adjudicated on the merits in state court. <u>See</u> <u>Lee v. Glunt</u>, 667 F.3d 397, 403 (3d Cir. 2012) (citing <u>Cone v. Bell</u>, 556 U.S. 449, 472 (2009)).  "[I]f the state court did not reach the merits of the federal claims, then they are reviewed de novo." <u>Id.</u>   In that case, the federal habeas court must presume that any factual determinations by the state court are correct, unless the petitioner rebuts that presumption by clear and convincing evidence. <u>See</u> <u>id.</u> (citing 28 U.S.C. § 2254(e)(1)).

### C.     Standard for Ineffective Assistance of Counsel Claims

A claim for violation of the Sixth Amendment right to effective assistance of counsel requires the petitioner to show that his counsel's performance was deficient and that the deficient performance prejudiced his defense. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).

11

To establish deficient performance, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." See id. at 688.  The reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." See id. at 689.  To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." See id. at 694.  In deciding whether a petitioner has shown prejudice, the court "must consider the totality of the evidence before the judge or jury." See id. at 695.

## III.    DISCUSSION

Sepulveda's amended petition asserts ten claims for relief.  The Court will first address Claim II because it requires the resolution of issues related to exhaustion and procedural default.  The Court will then address the remaining claims in the order in which they appear in the amended petition.

### A.    Claim II - Brady Claim Based on Suppression of Otto's Statements

Sepulveda claims that the Commonwealth suppressed favorable material evidence in violation of his right to due process under Brady v. Maryland, 373 U.S. 83, 87 (1963).  (Doc. No. 31 ¶¶ 80-101.)  Respondents contend that Sepulveda has not exhausted this claim in state court because the Pennsylvania Supreme Court declined to address the merits of the claim.  (Doc. No. 49 at 10-13); see Sepulveda III, 144 A.3d at 1280-81.  The Court will first set forth the relevant

background and address exhaustion and procedural default before turning to the merits of the claim.

### 1.      Factual and Procedural Background

Sepulveda offered a defense at trial that he was only guilty of voluntary manslaughter rather than first-degree murder because the homicides were justified by his subjective, but unreasonable, belief that he was acting in defense of others.  See Sepulveda III, 144 A.3d at 1271; 18 Pa. Cons. Stat. §§ 506, 2503(b).  According to Sepulveda's trial testimony, just prior to the shootings, he went upstairs and smoked some drugs with Otto, who told him that "she was scared [Mendez] was going to do something to her and the kids."  (Doc. No. 59-11 at 19-20.)  Sepulveda then went downstairs, where Heleva, Mendez and Lopez were standing in the kitchen.  (Id. at 20.)  Mendez began "throwing punches at Heleva" and Lopez "jumped in, two to three punches."  (Id.)  Sepulveda then "got scared" and grabbed the shotgun and shot Lopez and Mendez.  (Id.)  Sepulveda testified that he shot the two men to stop them from beating up Heleva, out of concern that Mendez or Lopez might get the shotgun and shoot Sepulveda, and to protect Otto's children.  (Id. at 21-22, 47, 58.)  Otto testified as a prosecution witness, but neither the prosecutor nor Anders asked whether she feared that Mendez would harm her children or whether she had expressed that fear to Sepulveda.  See (Doc. No. 59-10 at 133-77).

In his PCRA petition, Sepulveda alleged that Anders was ineffective for failing to develop support for a defense of voluntary intoxication, including by failing to ask Otto about Sepulveda's drug use at the time of the homicides.  (Doc. No. 59-19 at 47-49.)  At a PCRA court hearing held on June 11, 2007, Otto testified that she and Sepulveda smoked crack cocaine the night of the homicides, that she told police after the incident that Sepulveda "was high to the point of being crazy," and that she would have testified to that effect if asked at trial.  (Doc. No.

59-15 at 15-19.)  She also testified that following the homicides she was charged with endangering the welfare of her children and that those charges were resolved in an arrangement whereby she agreed to testify against Sepulveda and Heleva.  (Id. at 17.)  She recounted that before trial Anders asked her to be a character witness for Sepulveda, but she was told by the prosecutors that this was not possible.  (Id. at 18.)

Otto also identified an unsigned affidavit prepared by Sepulveda's attorneys and confirmed that it reflected information she had given them.  (Id. at 20-22, Doc. No. 64-31.)  The draft affidavit stated that, during the summer before the homicides, Mendez threatened to burn the house down with Otto and her children inside.  (Doc. No. 64-31 at 3-4.)  As a result, both Otto and Sepulveda were scared all the time for themselves and the children.  (Id. at 4.)  Otto stated that "I know that [Sepulveda] initially participated in the violence with [Mendez] and [Lopez] because he was protecting me and the children."  (Id. at 5.)  The draft affidavit also recounted that Otto agreed to testify against Sepulveda after the District Attorney presented her with two choices.  (Id. at 5-6.)  If Otto chose to testify, she would be released from jail, her children would be placed with relatives and kept out of foster care, and there would be a chance that Otto and the children could be reunited.  (Id. at 5.)  If Otto chose not to testify, she would remain in jail, be fully prosecuted, and the children would be placed with strangers in foster care and ultimately put up for adoption.  (Id.)  Otto testified that she made and initialed changes to the draft affidavit but chose not to sign it because she was afraid to come back to court and wanted to get her children back.  (Doc. No. 59-15 at 21-22.)  At the request of Sepulveda's counsel, the PCRA court received the unsigned affidavit into evidence.  (Doc. No. 59-17 at 60.)

The PCRA court denied relief on the PCRA petition, which the Pennsylvania Supreme Court affirmed, except with respect to the claim of ineffective assistance of counsel in the

penalty phase.  See Sepulveda II, 55 A.3d at 1151.  The supreme court found deficient

performance due to Anders' failure to investigate and present evidence of Sepulveda's mental

illness and traumatic childhood.  See id. at 1130-31.  The supreme court remanded to the PCRA

court to determine whether Sepulveda was prejudiced by Anders' deficient performance and to

address the FCDO's authority to represent Sepulveda in the PCRA proceedings.  See id. at 1151.

Following remand, Sepulveda filed a pro se PCRA petition based on newly discovered

evidence, to which he attached a revised and signed version of Otto's affidavit.  (Doc. No.

59-33.)  The PCRA court ordered that the pro se petition be docketed and served on Sepulveda's

counsel, who formally submitted Otto's signed affidavit.  See Sepulveda III, 144 A.3d at 1275.

After resolving the issue relating to the FCDO's representation, the PCRA court scheduled a

hearing for April 20, 2015 to address the issue of prejudice in the penalty phase and the newly

discovered evidence claim.  See id.

At the PCRA court hearing, Otto testified that she told Sepulveda prior to and on the

night of the homicides that she was afraid that Mendez would hurt her children.  (Doc. No. 59-18

at 32-35.)  Otto also recounted that, while she was in jail on the charge of endangering the

welfare of her children, District Attorney Mark Pazuhanich ("Pazuhanich") told Otto that if she

did not cooperate he would keep her in jail and put her children up for adoption.  (Id. at 35.)

Otto testified that she told Pazuhanich that she used drugs with Sepulveda the night of the

homicides and that she was afraid that Mendez would hurt her children.  (Id. at 35-36.)  Otto

explained that when she testified in the PCRA court in 2007 she was not willing to testify to her

conversations with Pazuhanich because she did not want to do anything that could hurt her

efforts to regain custody of her children.  (Id. at 37-38.)  She no longer had that concern because

her children had become adults.  (Id. at 38.)

15

At the conclusion of the hearing, Sepulveda filed a motion to amend his initial, timely filed PCRA petition to include three claims based on Otto's testimony: (1) newly discovered evidence under state law; (2) violation of <u>Brady</u> based on the prosecutor's nondisclosure of Otto's statements; and (3) ineffective assistance of counsel to the extent that Anders was or should have been aware of the evidence. (Doc. No. 64-2.) As authority for allowing the amendment, Sepulveda relied on Rule 905(A) of the Pennsylvania Rules of Criminal Procedure. (<u>Id.</u> at 3); <u>see</u> Pa. R. Crim. P. 905(A).[5] In a later brief, Sepulveda made the alternative argument that his claims were timely even if the proposed amendment was considered a second or successive PCRA petition. (Doc. No. 59-43 at 5-7); <u>see</u> 42 Pa. Cons. Stat. § 9545(b)(1)(i)-(ii).[6]

Following the hearing, the PCRA court found that Sepulveda suffered prejudice as a result of Anders' deficient performance in the penalty phase and ordered a new capital sentencing hearing. (Doc. No. 59-32 at 16-17.) The PCRA court also granted Sepulveda's

---

[5] Rule 905(A) provides: "[t]he judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at any time. Amendment shall be freely allowed to achieve substantial justice." <u>See</u> Pa. R. Crim. P. 905(A).

[6] 42 Pa. Cons. Stat. § 9545(b) provides in relevant part:

> Time for filing petition.– (1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that: (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States; (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

motion to amend his initial PCRA petition.  (<u>Id.</u> at 17-18.)  The PCRA court relied on Rule

905(A), explaining its understanding of the rule as follows:

> [T]he Pennsylvania Supreme Court has expressly stated that a court may grant leave
> to amend a timely filed petition at any time, even many years after the initial
> petition, if the court deems it appropriate.  <u>Com. v. Flanagan</u>, 854 A.2d 489,
> 499-500 (Pa. 2004) (allowing amendment of post-conviction petition 11 years after
> filing of original petition).  Moreover, the Pennsylvania Supreme Court held the
> amendment does not even need to "substantively align with the initial filing." <u>Id.</u>

(Doc. No. 59-32 at 17.)  The PCRA court reasoned that it was appropriate to permit Sepulveda to

amend his initial PCRA petition because doing so would allow his claims to be resolved and the

new capital sentencing hearing to proceed without concern that a second PCRA petition might

result in reversal of the conviction at some point in the future.  (<u>Id.</u> at 18.)  On the merits, the

PCRA court concluded that Otto's testimony did not satisfy the PCRA standard for newly

discovered evidence claims because it was known to Sepulveda at the time of trial and because it

would not likely result in a different verdict if a new trial was granted.  (<u>Id.</u> at 20-22.)

        On appeal, the Pennsylvania Supreme Court held that the PCRA court had no authority to

permit the amendment to Sepulveda's initial PCRA petition because the petition had been fully

adjudicated and the PCRA court was required to proceed in conformance with the remand order.

<u>See</u> <u>Sepulveda III</u>, 144 A.3d at 1271.  The supreme court reached this conclusion by drawing on

several sources of Pennsylvania law.

        First, the supreme court noted that the PCRA court and Sepulveda had mistakenly relied

on <u>Flanagan</u>, 854 A.2d at 495-96, as authority to allow the amendment.  <u>See</u> <u>Sepulveda III</u>, 144

A.3d at 1278.  The supreme court explained that the key factor in <u>Flanagan</u> was that, at the time

the petitioner sought to amend his original PCRA petition, the petition was still pending,

unadjudicated, before the PCRA court.  <u>See id.</u> (citing <u>Flanagan</u>, 854 A.2d at 495-96).  The court

noted that <u>Flanagan</u> contrasted this procedural posture with <u>Commonwealth v. Rienzi</u>, 827 A.2d 369 (Pa. 2003), which held that a PCRA court erred by treating a second PCRA petition as an amendment to an initial petition, because the initial petition had been withdrawn, leaving nothing to "amend." <u>See id.</u> (citing <u>Rienzi</u>, 827 A.2d at 371). The supreme court also noted that, in other decisions holding that PCRA courts properly allowed amendments, the PCRA courts had not yet ruled on the initial PCRA petitions. <u>See id.</u> (citing <u>Commonwealth v. Williams</u>, 828 A.2d 981, 993 (Pa. 2003), and <u>Commonwealth v. Padden</u>, 783 A.2d 299, 308-09 (Pa. Super. 2001)).

Second, the supreme court concluded that the PCRA court and Sepulveda had mistakenly relied on the language of Rule 905(A), without considering its underlying purpose. The court explained that Rule 905(A) "was created 'to provide PCRA petitioners with a legitimate opportunity to present their claims to the PCRA court in a manner sufficient to avoid dismissal due to a correctable defect in the claim pleading or presentation.'" <u>See id.</u> at 1279 (quoting <u>Commonwealth v. McGill</u>, 832 A.2d 1014, 1024 (Pa. 2003)). After a decision on the PCRA petition, "the matter is concluded before the PCRA court, having been fully adjudicated by that court, and the order generated is a final order that is appealable by the losing party." <u>See id.</u> (citations omitted). Thus, "[a]lthough liberal amendment of a PCRA petition is, in some circumstances, permitted beyond the one-year timeframe, <u>see</u>, <u>e.g.</u>, <u>Flanagan</u>, 854 A.2d at 499-500, Rule 905(A) cannot be construed as permitting the rejuvenation of a PCRA petition that has been fully adjudicated by the PCRA court." <u>See</u> <u>Sepulveda III</u>, 144 A.3d at 1279.

Third, the supreme court considered four of its prior decisions involving remands, stating that "[w]e have consistently held that in the absence of permission from this Court, a PCRA petitioner is not entitled to raise new claims following our remand for further PCRA proceedings." <u>See id.</u> at 1279. Three of those decisions involved rulings by the supreme court

18

granting or denying permission for amendments on remand.  See Commonwealth v. Spotz, 18 A.3d 244, 328 (Pa. 2011); Commonwealth v. Rainey, 928 A.2d 215, 226 n.9 (Pa. 2007); Commonwealth v. Rush, 838 A.2d 651, 661 (Pa. 2003).  In the fourth decision, the supreme court held that the PCRA court correctly determined that a Brady claim first raised on remand was waived and additionally stated: "This Court explicitly limited the subject matter of the remand to the remaining issues already raised by appellees; we neither invited nor authorized appellees to raise additional collateral claims years after expiration of the PCRA time-bar."  See Commonwealth v. Daniels, 104 A.3d 267, 285 (Pa. 2014).

Fourth, the supreme court relied on the rule of statutory interpretation that requires a court to "presume that the result was not intended to be 'absurd, impossible of execution or unreasonable.'"  See Sepulveda III, 144 A.3d at 1279 (quoting 1 Pa. Cons. Stat. § 1922(1)).  The court explained that this rule was relevant because, when it ordered limited proceedings on remand, "[a]bsent an order specifying otherwise, to construe Rule 905(A) as authorizing expansion of a case after thorough appellate review renders an absurd result."  See id.

Fifth, the supreme court considered the effect of Pennsylvania Rule of Appellate Procedure 2591.[7]  See Sepulveda III, 144 A.3d at 1279-80.  The court explained:

Rule 905(A) cannot be read or interpreted in a vacuum.  Pennsylvania Rule of Appellate Procedure 2591 specifically addresses a lower court's authority on

---

[7] Rule 2591 provides, in relevant part:

(a) General rule. On remand of the record the court or other government unit below shall proceed in accordance with the judgment or other order of the appellate court and, except as otherwise provided in such order, Rule 1701(a) (effect of appeals generally) shall no longer be applicable to the matter.

See Pa. R. A. P. 2591.  Rule 1701(a) provides: "General Rule.—Except as otherwise prescribed by these rules, after an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may no longer proceed further in the matter."  See Pa. R. A. P. 1701(a).

remand.  It provides that upon remand from a higher court, the lower court "shall proceed in accordance with the judgment or other order of the appellate court[.]"  Consequently, the breadth of Rule 905(A) is limited by Pa. R.A.P. 2591.

See id. (quoting Pa. R. A. P. 2591(a); citation and footnote omitted).

Finally, synthesizing the above authorities, the supreme court explained the applicable rule as follows:

> While we believe that our case law is clear, to the extent there is any lack of clarity in our prior decisions by their failure to consider Rule 905(A), we specifically hold that a PCRA court does not have discretion to treat new claims raised by a PCRA petitioner as an amended PCRA petition following remand from this Court unless such amendment is expressly authorized in the remand order.  Rather, application of the liberal amendment policy of Rule 905(A) requires that the PCRA petition in question is still pending before the PCRA court at the time the request for amendment is made.  Following a full and final decision by a PCRA court on a PCRA petition, that court no longer has jurisdiction to make any determinations related to that petition unless, following appeal, the appellate court remands the case for further proceedings in the lower court.  In such circumstances, the PCRA court may only act in accordance with the dictates of the remand order.  The PCRA court does not have the authority or the discretion to permit a petitioner to raise new claims outside the scope of the remand order and to treat those new claims as an amendment to an adjudicated PCRA petition.

See id. at 1280 (footnotes omitted).  Based on this rule, the supreme court vacated the PCRA court's decision, holding that, "[b]y permitting Sepulveda to amend his otherwise finally decided PCRA petition with new, previously unraised claims, the PCRA court exceeded the scope of our remand order and the scope of its authority."  See id. at 1280-81.

## 2.      Exhaustion and Procedural Default

The Court will first address Respondents' contention that Sepulveda has not exhausted his Brady claim because he has not completed one full round of the state's established review process.  (Doc. No. 49 at 10-13).  Sepulveda presented the Brady claim in his appeal from the PCRA court decision following remand and gave the Pennsylvania Supreme Court the opportunity to address it at that time.  See Sepulveda III, 144 A.3d at 1277.  Respondents do not

contend that Sepulveda has any remaining available state remedies.  See (Doc. No. 49 at 10-13). Therefore, the Court concludes that the claim is exhausted but procedurally defaulted.  See Shinn, 142 S. Ct. at 1732; Fahy, 516 F.3d at 188 n.18.

The Court will next address Sepulveda's contention that the procedural bar the supreme court relied on to deny review is not adequate to preclude federal review because it was not firmly established and regularly followed before it was applied in his case.  (Doc. No. 54 at 13-16.)  The Court notes that the supreme court acknowledged that its previous decisions had not specifically addressed a PCRA court's authority under Rule 905(A) in the context of remand proceedings.  See Sepulveda III, 144 A.3d at 1280.  The text of Rule 905(A) does not address this issue, stating only that a judge may grant leave to amend "at any time" and amendment "shall be freely allowed to achieve substantial justice."  See Pa. R. Crim. P. 905(A).  In Flanagan, which the PCRA court relied on as authority to allow the amendment, the supreme court instructed that "the prevailing rule remains simply that amendment is to be freely allowed to achieve substantial justice."  See Flanagan, 854 A.2d at 500 (citing Pa. R. Crim. P. 905(A)). As noted above, the supreme court explained that the PCRA court had misinterpreted the import of Flanagan by giving insufficient attention to its procedural posture and the other relevant legal authority discussed in Sepulveda III, 144 A.3d at 1278.  However, the PCRA court was not the only court to make this mistake before the supreme court clarified the rule.

In Commonwealth v. Gray, No. 1299 MDA 2012, 2013 WL 11252259 (Pa. Super. Nov. 7, 2013), appeal denied, 94 A.3d 1008 (Pa. 2014), the superior court affirmed a PCRA court's decision on remand that allowed the petitioner to amend his PCRA petition to include claims beyond the scope of the remand order.  See id. at *4.  The superior court noted that Rule 2591 would ordinarily limit the issues addressed on remand to those specified in the remand

order.  See id.  However, the court did not regard Rule 2591 as overriding Rule 905(A), at least

under the particular circumstances of the case.[8]  See id.  Like the PCRA court in Sepulveda's

case, both courts in Gray perceived no jurisdictional bar to granting leave to amend a PCRA

petition in remand proceedings if the PCRA court believed that doing so would achieve

"substantial justice."  See id. (quoting Pa. R. Crim. P. 905(A)).

      While the supreme court suggested that the rule precluding amendment of a PCRA

petition on remand was apparent from existing caselaw, the supreme court had not previously

limited the PCRA court's authority under Rule 905(A) in the explicit manner it did in

Sepulveda III, 144 A.3d at 1280.  Only one of the decisions cited by the supreme court held that

a PCRA court erred by allowing amendment of a PCRA petition, on the basis that the original

petition had been withdrawn.  See Rienzi, 827 A.2d at 371.  The remaining decisions either held

that amendments were proper or only that particular claims could not be addressed on remand.

See Williams, 828 A.2d at 993; Padden, 783 A.2d at 308-09; Spotz, 18 A.3d at 328; Rainey, 928

A.2d at 226 n.9; Rush, 838 A.2d at 661; Daniels, 104 A.3d at 285.  None of these cases

purported to apply the general jurisdictional limitation on a PCRA court's authority under Rule

905(A) as that rule was explained in Sepulveda III, 144 A.3d at 1280.

---

[8]  The concern in Gray related to a possible lack of impartiality on the part of the PCRA judge, who had also served as the trial judge.  The petitioner alleged in his pro se PCRA petition that his trial counsel was ineffective for failing to seek recusal of the trial judge based on her personal association with a key witness at trial.  See Gray, 2013 WL 11252259, at *1-2.  Acting as the PCRA judge, the trial judge appointed PCRA counsel, who did not file an amended petition; the judge then dismissed the petition without addressing the petitioner's pro se request for new counsel.  See id. at *2.  On appeal, the superior court held that the PCRA court erred by dismissing the petition and remanded for appointment of new counsel and an evidentiary hearing.  See id. at *3.  On remand, a different PCRA judge appointed new counsel, and granted a motion to amend the petition filed by that counsel.  See id.

Following the decision in Sepulveda's case, it is clear that a PCRA court has no authority to grant leave to amend a PCRA petition in remand proceedings without permission from the supreme court.  See id.  However, the supreme court's explanation of the rule required the synthesis of several sources of legal authority.  The Court concludes that Sepulveda cannot be deemed to have been "apprised of the existence" of such a rule when he filed the motion to amend his PCRA petition.  See Ford, 498 U.S. at 423 (citation and quotation marks omitted).  The Court further concludes that the rule was not firmly established and regularly followed at the time of Sepulveda's alleged default and therefore it is not adequate to bar federal habeas review of Sepulveda's Brady claim.  See Fahy, 516 F.3d at 187; Albrecht, 485 F.3d at 115-16.  Accordingly, the Court will review the claim de novo.  See Fahy, 516 F.3d at 190; Lark v. Sec'y Penn. Dep't of Corr., 645 F.3d 596, 618 (3d Cir. 2011).

### 3.    Legal Standard

"Under Brady, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment."  Smith v. Cain, 565 U.S. 73, 75 (2012) (citing Brady, 373 U.S. at 87).  To prove a Brady violation,

> a defendant must show the evidence at issue meets three critical elements.  First, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching." . . . Second, it "must have been suppressed by the State, either willfully or inadvertently." . . . Third, the evidence must have been material such that prejudice resulted from its suppression.

See Dennis v. Sec'y Penn. Dep't of Corr., 834 F.3d 263, 284-85 (3d Cir. 2016) (en banc) (quoting Strickler v. Green, 527 U.S. 263, 281-82 (1999)).  Evidence is "material" for Brady purposes "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  See Smith, 565 U.S. at 75 (quoting Cone, 556

23

U.S. at 469-70). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

### 4. Analysis

When exercising de novo review, a federal habeas court is bound by a state court's interpretation of state law, including an interpretation announced in the state court's review of the challenged conviction. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), and Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)). In addressing Sepulveda's ineffective assistance of counsel claim, as discussed in Section III.B, infra, the supreme court held that imperfect defense of others may not rest solely on the existence of a genuine, but unreasonable, belief that others are in danger. See Sepulveda II, 55 A.3d at 1125-26. Instead, the defense also requires "an objective assessment of the facts and circumstances surrounding the murders." See id. at 1126. Under this interpretation of state law, the supreme court concluded that Sepulveda's imperfect defense of others theory "was not particularly strong or plausible, for reasons having to do with circumstances other than [Sepulveda's] supposed mental state." See id. Those circumstances include that Sepulveda shot two unarmed men, who were only throwing punches at Heleva, that the children were upstairs while the altercation was occurring downstairs, that Sepulveda and Heleva chased down and dragged Mendez back to the house, and that Sepulveda's "entire course of conduct suggested that he was not free from fault in continuing, and indeed escalating, the difficulty." See id.

In reviewing Sepulveda's Brady claim de novo, the Court observes that even assuming that Otto's statements were favorable to the defense and withheld in violation of Brady,

Sepulveda fails to demonstrate materiality.  The Court concludes that this evidence is not material because in its absence Sepulveda received "a trial resulting in a verdict worthy of confidence."  See Kyles, 514 U.S. at 434.  At best, defense counsel could have used Otto's statements to corroborate Sepulveda's testimony that Otto told him that she was afraid that Mendez would hurt the children.  If the jurors believed Otto, they may have also credited Sepulveda's testimony that he believed Mendez posed a danger to the children.  Nonetheless, even assuming that the testimony in question would have produced the desired effect, there remain ample bases for the jury to reject the defense.  Sepulveda in fact had little likelihood of satisfying the requirements of the defense under state law, as articulated by the supreme court.  Upon review of the totality of the evidence in this case, the Court concludes that it is not reasonably probable that the result at trial would have been different if the statements in Otto's affidavit and her testimony at the PCRA hearing on April 20, 2015 had been disclosed before trial.  Accordingly, the Court will deny Sepulveda's second claim for relief.

### B.      Claim I - Ineffective Assistance of Counsel for Failure to Develop and Present Evidence to Support Defenses to First-Degree Murder Charges

Sepulveda claims that he was denied his right to effective assistance of counsel because his trial counsel failed to investigate his background and mental health, which would have produced evidence to support defenses to first-degree murder and could have resulted in Sepulveda's conviction of a lesser charge rather than first-degree murder.  (Doc. No. 31 ¶¶ 27-79.)  This claim has been exhausted.  See Sepulveda II, 55 A.3d at 1121-27.

### 1.      Factual and Procedural Background

At trial counsel Anders' request, the trial court instructed the jury on voluntary manslaughter based on imperfect defense of others.  (Doc. Nos. 59-11 at 107-08, 59-12 at 73-75.)  The only evidence offered to support the defense was Sepulveda's testimony that he shot

Lopez and Mendez to protect Heleva and the children, shortly after Otto told him that she feared Mendez would harm the children.  (Doc. No. 59-11 at 19-22, 58.)  Anders mentioned the defense only in passing in his closing argument.  (Doc. No. 59-12 at 25-26.)

In his PCRA petition, Sepulveda claimed that he was denied his right to effective assistance of counsel because Anders failed to investigate Sepulveda's background and mental health.  (Doc. No. 59-19 at 43-55.)  At an evidentiary hearing in the PCRA court, Anders identified correspondence indicating that before trial he contacted Dr. Eric Fine ("Dr. Fine"), a psychiatrist, in an effort to obtain an expert opinion that Sepulveda was experiencing cocaine-induced psychosis at the time of the homicides.  (Doc. Nos. 59-14 at 11-18, 67-2 at 1-2.)  After reviewing material relating to Sepulveda's use of cocaine and his inconsistent statements to police, Dr. Fine informed Anders that it did not support a diagnosis of cocaine delirium or cocaine-induced psychotic disorder or a conclusion that Sepulveda would have been unable to form the specific intent to kill the victims.  (Doc. No. 67-2 at 6-7.)

Sepulveda presented evidence in the PCRA court that he claimed Anders could have developed if he had conducted a proper investigation.  Three of Sepulveda's family members—his mother, Yolanda Maisonet, his cousin, Alex Sepulveda, and his maternal uncle, Juan Ramon Rivera—testified about Sepulveda's background and mental health issues.  See Sepulveda II, 55 A.3d at 1118.  The information provided by these witnesses included: that Sepulveda grew up in neighborhoods scarred by drugs and violence; that both he and his mother were physically abused by his father, an alcoholic; that Sepulveda had trouble in school; and that mental illness and addiction ran in the family.  See id.  Four other witnesses—Otto, Heather Mirel, Juan Pena, and Deanna Flowers—testified to Sepulveda's habitual use of crack cocaine, including on the

night of the murders, and that he became agitated, paranoid, and delusional when using crack cocaine.  See id. at 1118-19.

Sepulveda also presented the reports and testimony of three mental health experts who met with and evaluated him and reviewed information about his life history, his drug addiction, and his trial and conviction.  See id. at 1119-20.  Dr. Antonio Puente ("Dr. Puente"), a neuropsychologist, opined that Sepulveda had mild to borderline neuropsychological deficits which, in combination with his history of childhood abuse and dysfunction, impaired his ability to control his impulses and to appreciate the consequences of his conduct.  (Doc. No. 67-12 at 10.)  According to Dr. Puente, these impairments became substantial when Sepulveda was under the influence of crack cocaine, and even more pronounced when he was under significant stress. (Id.)  Based on what he knew of Sepulveda's background and drug use, Dr. Puente concluded that Sepulveda's deficits, combined with the circumstances on the night of the homicides, diminished his ability to premeditate and deliberate but did not entirely deprive him of that ability.  (Doc. No. 59-16 at 63-65.)

Dr. Pablo Stewart ("Dr. Stewart"), a psychiatric consultant, concluded that Sepulveda suffered from Posttraumatic Stress Disorder ("PTSD"), Cognitive Disorder Not Otherwise Specified ("NOS"), polysubstance dependence, and Cocaine-Induced Psychotic Disorder.  (Doc. Nos. 67-12 at 53-56, 59-15 at 38-39.)  Dr. Stewart opined that Sepulveda's ability to formulate specific intent at the time of the homicides was significantly impaired by the combined impact of his PTSD and cognitive impairments and the psychotic symptoms he suffered at the time of the offense.  (Doc. Nos. 67-12 at 55-57, 59-15 at 85-86.)

Dr. Richard Dudley ("Dr. Dudley"), a psychiatrist, concluded that Sepulveda suffered from Anxiety Disorder NOS with significant symptoms of PTSD, Cocaine Dependence and

Cocaine-Induced Psychotic Disorder, and Organic Brain Damage of a type that impaired his decision-making.  (Doc. No. 67-12 at 88.)  Dr. Dudley opined that, on the night of the homicides, Sepulveda's impulsiveness and diminished ability to make judgments and understand the consequences of his actions was triggered by a perceived threat against the children, which was a particularly potent trigger and reminder of his own childhood abuse.  (Id.)  Dr. Dudley also concluded that Sepulveda's capacity to form specific intent to commit the crimes was diminished because of his paranoid, irrational and hyper-reactive state brought on by the combination of his major psychiatric difficulties, the triggering events, and his abuse of crack cocaine.  (Doc. Nos. 67-12 at 89, 59-17 at 54.)

The PCRA court denied relief on Sepulveda's ineffective assistance of counsel claim. (Doc. 59-37 at 21-27.)  The PCRA court found that Anders had a reasonable basis for not developing and presenting evidence of Sepulveda's cocaine use, given his apparent strategy of steering the jury's attention away from Sepulveda's drug activities.  (Id. at 25.)  The PCRA court also found that Sepulveda failed to show that the outcome of the guilt phase of his trial would have been different had Anders presented an intoxication defense, based on the court's assessment that the witnesses who testified regarding Sepulveda's drug use were not credible and therefore he had not shown that he was suffering from cocaine-induced psychosis.  (Id. at 24-26.) The court also found that Anders had a reasonable basis for his strategic decision to pursue imperfect self-defense rather than a diminished capacity defense.  (Id. at 27.)

On appeal, the Pennsylvania Supreme Court affirmed the PCRA court's denial of relief, although it based its decision on different reasoning.  See Sepulveda II, 55 A.3d at 1121-27. With respect to diminished capacity, the supreme court stated that "we do not doubt that trial counsel could have uncovered some mental health evidence if he had conducted a more thorough

pre-trial investigation."  See id. at 1123.  However, the court found that Anders was not

ineffective for two reasons.  First, the court viewed the defense as weak even considering the

expert evidence Sepulveda presented in the PCRA court:

> [A]s a practical matter, the notion that a diminished capacity defense might succeed
> with a jury, in the face of the circumstances of the murders here—including chasing
> the second victim down and bringing him back to the crime scene to finish him off,
> hiding and humiliating the corpses, speaking to police—relatively far-fetched.
> Moreover, the expert opinions below primarily focused on PTSD and
> hypervigilance, with the experts claiming that [Sepulveda] lacked the ability to
> control his actions or that he acted impulsively. . . . It is not clear whether such
> mental health opinion evidence would have been admissible to support a
> diminished capacity defense or, if admissible, would have been particularly strong
> or helpful.  We have stressed the limited nature of a diminished capacity defense;
> at best, [Sepulveda]'s proffer strains the outer bounds of evidence that would be
> admissible to support the defense.

See id. at 1123.  Second, the court explained that a successful diminished capacity defense would

have required Sepulveda to concede his guilt to third-degree murder, which would have been

inconsistent with his written statement to the police and his trial testimony.  See id.  The court

then concluded:  "In this case, given [Sepulveda]'s existing accounts of his actions, the physical

evidence, and the weakness of the now-proffered evidence as support for diminished capacity,

we conclude that [Sepulveda] has failed to prove that counsel was ineffective for not pursuing a

diminished capacity defense."  See id. at 1124.

With respect to imperfect defense of others, the supreme court found that there was

nothing unreasonable in Anders' decision regarding cocaine-induced psychosis because he

pursued this line of investigation with Dr. Fine before trial but ultimately found it unfruitful.  See

id. at 1125.  The court also concluded that Sepulveda failed to demonstrate a reasonable

probability that the outcome of his trial would have been different if the expert evidence

presented in the PCRA court had been offered at trial.  See id. at 1126-27.  To support this

conclusion, the supreme court first described the two components of an imperfect self-defense voluntary manslaughter theory: "the defendant's subjectively-held belief of danger posed by the victim, as to which expert testimony [is] admissible, and the objective measurement of that belief, i.e., the reasonableness of that held belief, as to which expert testimony [is] inadmissible." See id. at 1125 (citing Commonwealth v. Sheppard, 648 A.2d 563, 568 (Pa. Super. 1994)).  The supreme court further stated that "a viable claim of self-defense voluntary manslaughter cannot be based solely on the subjective state of mind of the defendant."  See id. at 1126 (citing Sheppard, 648 A.2d at 569)  The supreme court then reasoned as follows:

> We have no doubt that expert mental health testimony would have been admissible and relevant to the imperfect defense of others defense that the trial court determined was adequately supported by the facts so as to allow counsel to pursue the defense.   However, [Sepulveda] has not shown that the addition of such testimony, concerning one of the two central aspects of a claim of imperfect belief of defense of others, creates a reasonable probability that the jury would have returned verdicts of involuntary [sic] manslaughter.  As we noted at the outset, this defense was not particularly strong or plausible, for reasons having to do with circumstances other than [Sepulveda]'s supposed mental state.  [Sepulveda] shot two unarmed men, who were doing no more than throwing punches at Heleva.  By [Sepulveda]'s own testimony, the victims were "beating up" Heleva and he "just got scared and grabbed the shotgun" and fired two shots.  NT 11/21/2002 at 634.  Furthermore, the facts also demonstrate that Heleva's children were upstairs at the time of the incident, while the initial altercation—into which [Sepulveda] introduced the firearm—was occurring downstairs.  Most damning is the fact that [Sepulveda] and Heleva chased down and dragged the wounded Mendez back to the house before killing him with a hatchet; any self-defense-related claim as to Mendez was clearly doomed by this fact.  Certainly, at the time [Sepulveda] and Heleva chased down Mendez, any belief that others were in imminent danger was objectively unreasonable.   Moreover, [Sepulveda]'s entire course of conduct suggested that he was not free from fault in continuing, and indeed escalating, the difficulty.   Under such circumstances, we conclude that [Sepulveda] has not demonstrated a reasonable probability that, if only counsel would have introduced supporting expert testimony on the subjective half of his imperfect defense of others claim, the jury would have credited that his perceptions, if genuinely held, were objectively reasonable.  Accordingly, [Sepulveda] has failed to establish that trial

counsel was ineffective for failing to proffer mental health evidence in support of
his imperfect belief of defense of others claim.

See id. at 1126-27 (footnote and citation omitted).

### 2.      Analysis

The Court will first address the claim that Anders was ineffective because he failed to

pursue a diminished capacity defense.  Sepulveda contends that the supreme court's decision on

this aspect of the claim is based on two unreasonable factual determinations: (1) that Sepulveda's

expert testimony may not have been admissible to support a diminished capacity defense; and (2)

that a diminished capacity defense would have been inconsistent with Sepulveda's trial

testimony.  (Doc. No. 42 at 45-49.)  As explained below, both of these determinations are based

in part on the supreme court's interpretation of state law concerning the diminished capacity

defense, which is binding on this Court in federal habeas review.  See Bradshaw, 546 U.S. at 76.

The supreme court's assessment that Sepulveda's expert evidence "strains the outer

bounds of evidence that would be admissible to support the defense" is based on Pennsylvania

caselaw specifying that "evidence showing that the defendant lacked the ability to control his

actions or acted impulsively is irrelevant to intent to kill and thus is not admissible to support a

diminished capacity defense."  See Sepulveda II, 55 A.3d at 1122 (citing Commonwealth v.

Hutchinson, 25 A.3d 277, 312 (Pa. 2011)).  Although Sepulveda's experts opined that his ability

to form specific intent was impaired, those opinions depended in part on conclusions that

Sepulveda suffered from PTSD, which impaired his ability to control his actions and caused him

to act impulsively.  Under Pennsylvania law, at least some portion of this evidence may have

been inadmissible.  See Saranchak v. Beard, 616 F.3d 292, 313 (3d Cir. 2010) (noting that expert

testimony concerning petitioner's auditory hallucinations, delusion, paranoia, and tenuous ability

to apprehend reality would not be admissible under Pennsylvania law to support diminished

capacity defense).  Accordingly, the Court concludes that the supreme court did not base its decision on an unreasonable factual determination in considering the potential inadmissibility of portions of Sepulveda's expert evidence as one factor in its assessment of the probability of a different result at trial.  See Sepulveda II, 55 A.3d at 1123-24.

The supreme court's conclusion that a diminished capacity defense would have been inconsistent with Sepulveda's trial testimony is also based on an interpretation of state law.  See id. at 1123.  Sepulveda contends that the supreme court's conclusion is unreasonable because he could have been convicted as an accomplice.  (Doc. Nos. 42 at 47, 54 at 10-11.)  However, this position is inconsistent with Pennsylvania decisions suggesting that a diminished capacity defense is not available to a defendant who claims that an accomplice killed the victim.  See Commonwealth v. Sanchez, 82 A.3d 943, 977-78 & n.14 (Pa. 2013); Commonwealth v. Johnson, 815 A.2d 563, 578-79 (Pa. 2002); Commonwealth v. Laird, 726 A.2d 346, 353 (Pa. 1999).

While Sepulveda admitted at trial that he shot both Lopez and Mendez, he also maintained that it was Heleva who shot Lopez the second time and attacked Mendez with the hatchet and killed him.  (Doc. No. 59-11 at 22-25.)  Consistent with this testimony, Anders argued in closing that it was Heleva, not Sepulveda, who caused the deaths of both Lopez and Mendez.  (Doc. No. 59-12 at 6-7, 24-25.)  The Court concludes that the supreme court did not base its decision on an unreasonable determination of the facts by applying state law to find that a diminished capacity defense would have been inconsistent with Sepulveda's trial testimony and statement to the police.  See Sepulveda II, 55 A.3d at 1123.

The Court will next address Sepulveda's ineffective assistance of counsel claim based on Anders' failure to develop evidence to support the imperfect defense of others theory that he presented at trial.  Sepulveda contends that the supreme court's decision is contrary to Strickland

because it applied the wrong legal standard by referring to "a reasonable probability that the jury would have returned verdicts of <u>involuntary</u> manslaughter." (Doc. No. 42 at 43) (citing <u>Sepulveda II</u>, 55 A.3d at 1126) (emphasis added)). The Court notes that elsewhere in its discussion of this issue the supreme court consistently describes the relevant charge as <u>voluntary</u> manslaughter. <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1124-26. Viewed in context, the Court concludes that the single reference to involuntary manslaughter is a typographical error and does not indicate that the supreme court applied the wrong legal standard in assessing the reasonable probability of a different result at trial.

The Court further concludes that the supreme court reasonably applied <u>Strickland</u> to deny relief on Sepulveda's ineffective assistance of counsel claim. The Court finds that it is unnecessary to address deficient performance because the claim can be disposed of based on the <u>Strickland</u> prejudice prong. <u>See</u> <u>Strickland</u>, 466 U.S. at 697. The supreme court correctly identified that standard and reasonably applied it to conclude that it was not reasonably probable that the jury would have reached a different result if the defense had offered the new evidence presented in the PCRA proceedings. <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1126-27. Sepulveda contends this prejudice determination is an unreasonable application of <u>Strickland</u> because the court virtually ignored the subjective component of imperfect defense of others and omitted from its analysis the "totality of the circumstances" standard that would have applied to the defense. (Doc. No. 42 at 43-44.) The Court notes that the supreme court's analysis is based on its view that, under Pennsylvania law, imperfect defense of others requires more than an honestly held, subjective belief that others are in danger. <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1125-26. "Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'" <u>Priester v. Vaughn</u>, 382 F.3d 394, 402 (3d Cir. 2004) (quoting <u>Estelle</u>, 502 U.S. at

67-68).  Based on the supreme court's interpretation of the requirements of imperfect defense of others under state law, which is binding on this Court, the Court concludes that the supreme court did not unreasonably apply the Strickland prejudice standard.

Finally, the Court concludes that it is unnecessary to address Sepulveda's contention that the supreme court made an unreasonable factual determination by finding that Anders fully explored the possibility that Sepulveda suffered from cocaine-induced psychosis but was told by Dr. Fine that he could not offer a supporting opinion.  (Doc. No. 42 at 44-45.)  This finding appears in the supreme court's analysis of deficient performance.  See Sepulveda II, 55 A.3d at 1125.  As already discussed, the Court finds that it is unnecessary to address deficient performance because it has concluded that the supreme court's prejudice determination reflects a reasonable application of the Strickland standard.

For the foregoing reasons, the Court concludes that the supreme court's disposition of Sepulveda's claim did not result in a decision contrary to, or involve an unreasonable application of, clearly established federal law and did not result in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  See 28 U.S.C. § 2254(d).  Accordingly, the Court will deny Sepulveda's first claim for relief.

C.      **Claim III - Guilt Phase Instructions**

Sepulveda claims that errors in the jury instructions violated his right to due process and that the failure of trial and appellate counsel to challenge those errors violated his right to effective assistance of counsel.  (Doc. No. 31 ¶¶ 102-130.)  These claims have been exhausted. See Sepulveda II, 55 A.3d at 1140-45.

### 1.      Factual and Procedural Background

Sepulveda's claims concern three aspects of the jury instructions.  First, he contends that the trial court inaccurately described imperfect defense of others by mistakenly using the terms "involuntary manslaughter" and "unmistaken belief" in the following instruction:

> I've been asked to charge on <u>involuntary</u> manslaughter.  As I said to you previously when I defined malice, there can be no malice when certain reducing circumstances might be present.  When these circumstances are present, a killing may be voluntary manslaughter but not murder. And this is true when the Defendant kills in the heat of passion or following a serious provocation.  Or kills under an <u>unmistaken</u> belief in justifying circumstances.

(Doc. No. 31 ¶ 108) (quoting Doc. No. 59-12 at 67-68) (emphases added)).  Second, Sepulveda contends that the trial court failed to instruct, as required by <u>Commonwealth v. Heatherington</u>, 385 A.2d 338, 341 (Pa. 1978), that the prosecution had to disprove imperfect defense of others beyond a reasonable doubt in order to meet its burden of proof on the element of malice.  (Doc. No. 31 ¶¶ 115-119.)  Third, Sepulveda contends that the instruction on accomplice liability did not include the required element of specific intent.  (Doc. Nos. 31 ¶¶ 120-125, 59-12 at 75-76.)

Sepulveda raised claims concerning these alleged instructional errors for the first time in his PCRA petition, where he claimed that the flawed instructions violated his right to due process and that his trial and appellate counsel were ineffective by failing to challenge the instructions at trial or on direct appeal.  (Doc. No. 59-19 at 56-68.)  In his testimony at the PCRA hearing, Anders agreed that it appeared from the transcript that the trial court misspoke in stating that one who kills under the "unmistaken belief" in justifying circumstances would be guilty of voluntary manslaughter.  (Doc. No. 59-14 at 41-42.)  However, he did not recall if he heard that misstatement when the instruction was given at trial.  (<u>Id.</u> at 42.)  When asked whether in retrospect he would consider the apparent error to be worthy of appellate review in a capital case, he responded: "Is it worthy? Take a shot.  Does it have merit?  That is another story."  (<u>Id.</u> at 43.)

35

The PCRA court found that the due process claims were waived because they were not raised at trial or on direct appeal but nonetheless reviewed the claims to determine whether Anders was ineffective for failing to preserve and litigate them.  (Doc. No. 59-37 at 28.)  The PCRA court concluded that the instructions, read in their entirety, accurately reflected the applicable law and therefore Anders was not ineffective for failing to object to the instructions.  (Id. at 29-34.)

The Pennsylvania Supreme Court affirmed the PCRA court's denial of relief.  See Sepulveda II, 55 A.3d at 1140-45.  First, the supreme court noted that it had no doubt that counsel could have objected to the trial court's "isolated misstatements" regarding "involuntary manslaughter" and "unmistaken" belief.  See id. at 1142.  However, the supreme court stated that the issue was whether counsel "was obliged to do so, and if so, whether the failure to object led to actual prejudice."  See id.  In considering whether counsel was obliged to object, the court concluded that "the charge, considered as a whole, accurately conveyed the law," because the instructions that preceded and followed the trial court's misstatements correctly referred to voluntary manslaughter and "correctly stated the elements of the offense" by stating that "an unreasonable belief in justifying circumstances" could support a finding of voluntary manslaughter.  See id.  The court also noted that Sepulveda did not "suggest that his defense was argued to the jury, in counsel's closing, other than according to the governing law."  See id.  Based on this analysis, the court concluded that "the charge taken as a whole, and considered on the context of the trial as a whole, appropriately instructed the jury on imperfect belief of defense of others and [Sepulveda] has not established that counsel was obliged to object and that the failure to do so caused the first-degree murder verdict."  See id.

36

Second, the supreme court found that, although the trial court never specifically identified malice as the element that defense of others would negate, the trial court adequately instructed the jury concerning the prosecution's burden of disproving the defense. See id. at 1143.  Finding the instruction on this point to be adequate, the supreme court concluded that Anders could not be deemed ineffective for failing to object to the instruction. See id. (citing Commonwealth v. Natividad, 938 A.2d 310, 328 (2007)).

Third, the supreme court did not appear to dispute that the accomplice liability instruction did not include the element of specific intent to kill. See id. at 1143-45.  However, the court found that Sepulveda failed to establish deficient performance due to inadequate briefing of the issue on appeal and because he did not ask Anders to explain why he did not object to the instruction. See id. at 1144.  The court also found that Sepulveda had not shown prejudice. See id. at 1144-45.  Regarding the murder of Mendez, the court reasoned that the jury must have found specific intent because it convicted Sepulveda of conspiracy to murder Mendez, which required a finding that Sepulveda intended to promote or facilitate the killing of Mendez. See id. at 1145.  The court also concluded that Sepulveda could not show prejudice based on his conviction for the murder of Lopez, given that he admitted at trial to shooting Lopez and the jury was instructed that it could not find him guilty of murder without finding that his conduct was the direct cause of the victim's death. See id. at 1145 n.32.

## 2.    Legal Standard

The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove each element of an offense beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364 (1970).  If an instruction contains some "ambiguity, inconsistency or deficiency," such that it creates a "reasonable likelihood" that the jury misapplied the law and relieved the prosecution of

its burden of proving each element beyond a reasonable doubt, the resulting conviction violates the defendant's right to due process.  See Tyson v. Superintendent Houtzdale SCI, 976 F.3d 382, 392 (3d Cir. 2020) (citations and internal quotation marks omitted).  An instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  See Waddington v. Sarausad, 555 U.S. 179, 191 (2009) (quoting Estelle, 502 U.S. at 72).  To obtain federal habeas relief, the petitioner must show that the erroneous instruction had a "substantial and injurious effect or influence in determining the jury's verdict."  See Whitney v. Horn, 280 F.3d 240, 258 (3d Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  If a petitioner satisfies the Brecht standard, he has also established prejudice under Strickland.  See id. (citing Strickland, 466 U.S. at 694).

### 3.  Analysis

The Court will first address Sepulveda's claims concerning the imperfect defense of others instruction.  Sepulveda contends that the supreme court unreasonably determined the facts because it characterized the trial court's erroneous use of the terms "involuntary manslaughter" and "unmistaken belief" as an "isolated misstatement" in a charge that as a whole correctly informed the jury of the law.  (Doc. No. 42 at 66-68) (quoting Sepulveda II, 55 A.3d at 1142).  Sepulveda also contends that the supreme court unreasonably applied Winship and its progeny in concluding that the instruction did not impermissibly relieve the prosecution of its burden of proving each element of the crime.  (Doc. No. 42 at 67-68.)  The Court concludes that neither contention has merit.

The supreme court used the term "isolated misstatement" to describe the trial court's mistaken references to "involuntary manslaughter" and "unmistaken belief."  See Sepulveda II, 55 A.3d at 1142.  The trial court referred to "involuntary" manslaughter only once.  (Doc. No.

59-12 at 67-68.)  The remainder of the instruction and the verdict sheet given to the jury correctly described the pertinent charge as "voluntary" manslaughter.  (Doc. Nos. 59-12 at 62, 64, 68, 69, 90, 59-71 at 4-5.)  Likewise, the trial court referred to "unmistaken belief" only once. (Doc. No. 59-12 at 68.)  The trial court immediately thereafter instructed that the jury could not find Sepulveda guilty of murder if he was under the "unreasonable belief that the circumstances were such that if they existed would have justified killing," which Sepulveda acknowledges is a correct statement of the standard.  (Doc. No. 31 ¶ 112) (quoting Doc. No. 59-12 at 68).  Thus, the Court concludes that the supreme court's use of the term "isolated" did not inaccurately describe the two times that the trial court misspoke.

The Court also concludes that the supreme court did not unreasonably apply Winship and its progeny in rejecting Sepulveda's ineffective assistance of counsel claim.  The supreme court reasonably concluded that, despite the trial court's two misstatements, the instruction, "taken as a whole, and considered in the context of the trial as a whole, appropriately instructed the jury on imperfect belief of defense of others."  See Sepulveda II, 55 A.3d at 1142.  As described above, the trial court's other instructions accurately referred to voluntary manslaughter and an unreasonable belief in justifying circumstances.  Moreover, as the supreme court noted, Sepulveda does not suggest that his defense was argued to the jury other than according to the governing law.  See id.  In addressing imperfect defense of others in closing argument, the prosecutor argued: "If it was an unreasonable belief, it could make it voluntary manslaughter. This is not even an unreasonable belief."  (Doc. No. 59-12 at 55-56); see Middleton v. McNeil, 541 U.S. 433, 438 (2004) (per curiam) (noting that state court may assume that counsel's arguments clarified an ambiguous jury charge, particularly where it is the prosecutor's argument that resolves an ambiguity in favor of the defendant).  For these reasons, the Court concludes that

the supreme court did not unreasonably apply <u>Winship</u> and its progeny in concluding that Sepulveda failed to establish ineffective assistance of counsel with respect to the imperfect defense of others instruction.

The Court will next address Sepulveda's claims concerning the instruction on malice. Sepulveda claims that the supreme court unreasonably applied <u>Winship</u> and its progeny in holding that the trial court adequately instructed on the prosecution's burden to disprove defense of others beyond a reasonable doubt.  (Doc. No. 42 at 68-69.)  He relies on <u>Heatherington</u>, 385 A.2d at 341, for his claim that <u>Winship</u> requires an instruction on the specific relationship between malice and self-defense. (Doc. Nos. 31 ¶¶ 115-117, 42 at 59-61.)  Sepulveda has cited no clearly established federal law as determined by the Supreme Court that requires the <u>Heatherington</u> instruction.  <u>See</u> (Doc. Nos. 31 ¶¶ 115-119, 42 at 59-61, 68-69, 54 at 17-18). Therefore, the Court concludes that the supreme court did not unreasonably apply <u>Winship</u> and its progeny in concluding that the jury was adequately instructed on the prosecution's burden of proof and for that reason that Anders was not ineffective for failing to object to the relevant instruction.

The Court will next address Sepulveda's claims concerning the accomplice liability instruction.  The Court will begin with Sepulveda's contention that de novo review is required because the supreme court did not adjudicate the federal due process claim but instead solely addressed the claim under state law.  (Doc. No. 42 at 69-70.)  The Court does not agree with Sepulveda's view of the supreme court's decision.  The supreme court concluded that Sepulveda failed to show prejudice as a result of any error in the accomplice liability instruction.  <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1144-45.  Deference under AEDPA is required so long as the state court identifies and applies the correct governing legal principle.  <u>See</u> <u>Albrecht</u>, 485 F.3d at 116;

40

Priester, 382 F.3d at 397-98.  The Court concludes that the supreme court did so here because it relied on two decisions to support its analysis, Commonwealth v. Wayne, 720 A.2d 456 (Pa. 1998), and Bronshtein v. Horn, 404 F.3d 700 (3d Cir. 2005), both of which reflect the correct governing legal principles.  See Sepulveda II, 55 A.3d at 1144.

In Wayne, the supreme court held that the defendant was not prejudiced by counsel's failure to object to an instruction on co-conspirator liability for first-degree murder that did not include the element of specific intent.  See Wayne, 720 A.2d at 465.  To reach that conclusion, the supreme court applied the state law standard which the Third Circuit Court of Appeals has held is equivalent to the Strickland standard.  See id. at 462; Tyson, 976 F.3d at 391.  The supreme court reasoned that, because the jury had convicted the defendant of conspiracy, and the sole object of the conspiracy was "the deliberate decision to take a life," "the only logical conclusion" was that the jury also determined beyond a reasonable doubt that the defendant possessed the specific intent to kill.  See Wayne, 720 A.2d at 465.

In Bronshtein, the Third Circuit Court of Appeals held that the jury was improperly instructed on co-conspirator liability because the jury could have believed that a finding of specific intent to kill was not needed in order to convict the petitioner of first-degree murder on the theory of co-conspirator liability.  See Brohnstein, 404 F.3d at 712.  However, the Third Circuit concluded that the error was harmless, citing Wayne as support for its reasoning that, by finding the petitioner guilty of conspiracy to commit murder, the jury must have found that he had the specific intent to kill.  See id. at 714 (stating that "[w]e agree with this analysis and hold that the error in the instructions on co-conspirator liability was harmless under the standard applicable in a federal habeas proceeding") (citing Wayne, 720 A.2d at 465).

41

The Court concludes that the supreme court's reliance on these two decisions to support its prejudice analysis indicates that it adjudicated the instructional claims under the applicable federal constitutional standards.  The ultimate issue under either the <u>Brecht</u> harmless error standard or the <u>Strickland</u> prejudice standard "reduces to determining what effect, if any, the erroneous instruction had on the jury's verdict."  <u>See</u> <u>Whitney</u>, 280 F.3d at 258.  The supreme court analyzed that issue and concluded that Sepulveda was not prejudiced by any alleged error in the accomplice liability instruction.  <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1145 & n.32.  That prejudice analysis is an adjudication on the merits that applies equally to Sepulveda's due process and ineffective assistance of counsel claims.  Therefore, the Court concludes that AEDPA review applies to both claims.

The Court further concludes that the supreme court's conclusion that Sepulveda failed to show prejudice based on the jury's verdict and the prosecution's theory at trial reflects a reasonable application of the <u>Strickland</u> and <u>Brecht</u> standards.  <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1144-45.  The prosecutor argued in closing that Sepulveda shot both victims and directly caused their deaths and that the jury could infer the specific intent to kill required to find him guilty of first-degree murder based on his use of a deadly weapon on vital parts of the victims' bodies. (Doc. No. 59-12 at 43-48.)  The prosecutor's only reference to accomplice liability was a brief argument that Sepulveda could be held responsible if it was Heleva who hit Mendez with the hatchet after he was forced back into the house.  (<u>Id.</u> at 53.)  The prosecutor ended that portion of his argument by telling the jury: "Do not get hung up on the ax.  The shots are sufficient for murder in the first degree."  (<u>Id.</u> at 54.)  The jury convicted Sepulveda of conspiracy to murder Mendez, based on instructions that required the jury to find that Sepulveda had the intent to promote or facilitate the crime of homicide or killing of Mendez.  (<u>Id.</u> at 72.)  Based on these

considerations, the Court concludes that the supreme court did not unreasonably conclude that Sepulveda was not prejudiced by any alleged error in the accomplice liability instruction. Cf. Brohnstein, 404 F.3d at 714 (concluding that guilty verdict on conspiracy to commit murder indicated that jury found defendant had specific intent to commit murder); Muhammad v. Superintendent Fayette SCI, No. 19-1905, 2021 WL 3662308, at *3 n.3 (3d Cir. Aug. 18, 2021) (unpublished) (concluding that state court's finding of no prejudice was not unreasonable under either Brecht or Strickland standard because there was a quantum of strong evidence at trial from which a jury could conclude that the petitioner had the intent to kill and from which a court could reasonably find that no different result would have occurred).

Finally, the Court will address Sepulveda's claim that the supreme court failed to analyze the cumulative effect of the instructional errors on his right to a fair trial. (Doc. No. 42 at 70.) As already discussed, the supreme court concluded that the trial court's instructions on imperfect defense of others and malice were adequate and that any error in the accomplice liability instruction was not prejudicial. In view of these conclusions, the Court concludes that it was not unreasonable for the supreme court to conduct no analysis of the cumulative effect of the claimed instructional errors on Sepulveda's right to a fair trial.

For the foregoing reasons, the Court concludes that the supreme court's disposition of these claims did not result in a decision contrary to, or involve an unreasonable application of, clearly established federal law and did not result in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d). Accordingly, the Court will deny Sepulveda's third ground for relief.

**D.     Claim IV - Commonwealth's Presentation of Materially False Evidence and Ineffective Assistance of Counsel for Failing to Correct the False Evidence**

Sepulveda claims that the prosecution violated his right to due process by presenting false evidence concerning his recorded statement to police.  (Doc. No. 31 ¶¶ 131-145.)  He also claims ineffective assistance of counsel based on trial counsel's failure to have the recording reviewed by an expert for the purpose of undermining the false evidence.  (Id. ¶¶ 146-151.)  These claims have been exhausted.  See Sepulveda II, 55 A.3d at 1137-39.

**1.     Factual and Procedural Background**

At trial, Trooper McAndrew testified that he recorded one of the statements Sepulveda made during his interrogation.  (Doc. No. 59-8 at 111-112.)  Clerical staff prepared a transcript of the recording, which McAndrew reviewed and corrected based on listening to the recording and his own recollection of the interview.  (Id. at 112-114, Doc. No. 64-22.)  Each juror was given a copy of the transcript to read as the recorded statement was played in court.  (Doc. 59-9 at 3-5.)  On cross-examination, Anders directed McAndrew's attention to the following section of the transcript:

> Sommers:      Okay, in fact he was bleeding on you right?
>
> Sepulveda:    At that moment yeah, yeah.
>
> Sommers:      Is that how the blood got on your clothes?
>
> Sepulveda:    On my pants.  I didn't see my shirt (not audible) when I finished playin' with him and stuff inside the house, that I look at my pants and started to feel that, that, that nausea stuff.

(Doc. No. 64-22 at 29) (emphasis added).  Anders asked whether McAndrew had "filled in the blanks" in this portion of the transcript, to which McAndrew responded, "I have no idea what I would have changed or not changed."  (Doc. No. 59-9 at 27.)  When Anders asked whether Sepulveda actually said, "when we finished pulling him," McAndrew responded, "whatever I

44

heard on the tape is what is in this transcript." (Id. at 27-28) (emphasis added).  On redirect examination, McAndrew testified that, at the request of the prosecutor, he had listened to this portion of the tape again the previous day and confirmed that the transcript reflected what he believed was said on the tape.  (Id. at 47.)  The trial court subsequently admitted the transcript into evidence, with no objection by Anders.  (Id. at 53.)

Aside from his cross-examination of McAndrew, Anders contested the accuracy of the transcript in two other ways during the defense case.  First, Sepulveda testified that he did not say that he "played with" Lopez or Mendez.  (Doc. No. 59-11 at 12.)  Second, Anders' secretary, Mary Jezierski, testified that she had listened to the tape and heard "when I finished pulling him," rather than "when I finished playin' with him." (Id. at 91-93) (emphasis added).

In his PCRA petition, Sepulveda alleged that the prosecution violated his right to due process by presenting false evidence and that Anders rendered ineffective assistance of counsel by failing to obtain a forensic evaluation of the tape to present an accurate version of what Sepulveda said.  (Doc. No. 59-19 at 73-80.)  Before the PCRA court, Sepulveda presented an enhanced version of the original recording, prepared by a forensic audio expert, along with a transcript which indicated that the disputed phrase was "when I finished fighting with him." (Doc. Nos. 67-16, 67-17 at 4-5) (emphasis added).

The PCRA court denied relief on both claims.  (Doc. No. 59-37 at 34-39.)  The PCRA court found that Sepulveda waived the due process claim by failing to raise it at trial or on direct appeal.  (Id. at 34-35.)  The PCRA court found that the ineffective assistance of counsel claim lacked merit because Anders made the jury aware of the possible discrepancy in the transcript, the jury heard the recorded statement itself, and Sepulveda had not shown that he was prejudiced by Anders' failure to submit the recording for forensic analysis.  (Id. at 38-39.)

The Pennsylvania Supreme Court affirmed the PCRA court's denial of relief.  See Sepulveda II, 55 A.3d at 1137-39.  The supreme court agreed with the PCRA court that the due process claim "is not cognizable to the extent it sounds in a claim of prosecutorial misconduct."  See id. at 1138.  The court noted that the recording and transcription were available to Sepulveda, and he could have objected based on his own memory of the interrogation and his ability to decipher his own speech.  See id.  The supreme court concluded that "[t]he fact that [Sepulveda], with the help of an expert, now has a new interpretation of what he said on the audio recording that was disclosed to him does not prove that the Commonwealth committed 'misconduct.'"  See id.

The supreme court also affirmed the PCRA court's denial of relief on the ineffective assistance of counsel claim.  The supreme court first found that the underlying due process claim lacked merit, reasoning as follows:

> [T]he record supports the PCRA court's determination that there was simply no indication that the Commonwealth presented "false" evidence, much less that it did so intentionally.    [Sepulveda]'s expert's opinion does not establish what [Sepulveda] said as a mathematical certainty, or even as a fact; and even if it did, that opinion does not prove that the Commonwealth deliberately falsified the transcript or knowingly introduced false evidence.

See id. at 1138.  Next, the supreme court concluded that Anders was not ineffective for failing to secure a forensic analysis of the recording when "the recording itself was played for the jury and the jury had the firsthand opportunity to determine what [Sepulveda] actually said or whether the word in question was clear enough on the tape to raise some doubt regarding the transcription."  See id. at 1139.  Finally, the court found that "there is no reasonable probability that uncertainty related to this single word could outweigh [Sepulveda]'s three other confessions and the forensic evidence against him and produce a different verdict."  See id.

### 2.    Legal Standard

A state violates the Fourteenth Amendment's due process guarantee when it knowingly presents or fails to correct false testimony in a criminal proceeding.  See Haskell v. Superintendent Greene SCI, 866 F.3d 139, 145-46 (3d Cir. 2017) (citing Napue v. Illinois, 360 U.S. 264, 269 (1959), and Giglio v. United States, 405 U.S. 150, 153 (1972)).  The elements of a due process claim are: (1) the witness committed perjury; (2) the prosecution knew or should have known that the testimony was false; (3) the false testimony was not corrected; and (4) there is a reasonable likelihood that the perjured testimony could have affected the judgment of the jury.  See id. at 146 (citing Lambert v. Blackwell, 387 F.3d 210, 242 (3d Cir. 2004)).  A petitioner who establishes these elements is entitled to federal habeas relief without any additional showing of prejudice.  See id. at 152.

### 3.    Analysis

The Court will first address the due process claim.  Sepulveda argues that the supreme court's decision is based on an unreasonable application of Napue and its progeny to the extent that it considered that Sepulveda himself could determine what he said on the recording.  (Doc. No. 42 at 77-78.)  The Court notes that the supreme court offered this consideration as a reason for its agreement with the PCRA court's conclusion that Sepulveda waived the due process claim.  See Sepulveda II, 55 A.3d at 1138.  To the extent that the supreme court considered the merits of the due process claim in connection with the ineffective assistance of counsel claim, that analysis was based on the conclusion that Sepulveda did not prove that the prosecution knowingly presented false testimony.  See id.  In view of the fact that the only evidence Sepulveda offered on this point was the enhanced recording, the Court concludes that the supreme court did not unreasonably apply Napue and its progeny in reaching this conclusion.

47

The Court will next address the ineffective assistance of counsel claim.  The Court finds that it is unnecessary to address deficient performance because the claim can be disposed of based on the Strickland prejudice prong.  See Strickland, 466 U.S. at 697.  Sepulveda claims that the allegedly false evidence undermined his defense that he acted out of a genuine fear for the safety of others and provided ammunition for the prosecution's argument that he acted with malice and specific intent to kill.  (Doc. No. 31 ¶ 142.)  As already discussed supra, the imperfect defense of others theory had little likelihood of success in view of the circumstances of the murders.  In addition, there was strong evidence at trial supporting malice and specific intent, including Sepulveda's admissions that he shot both victims and pushed Mendez back into the house after he fled.  The jurors were made aware of the potential inaccuracy in the transcript and heard the recording itself, as well as Sepulveda's testimony that the transcript was inaccurate.  Upon review of the totality of the evidence, the Court concludes that the supreme court reasonably applied Strickland by finding that there was no reasonable probability of a different verdict if the jury had heard forensic evidence indicating that Sepulveda said he was "fighting" with Mendez rather than "playing" with him.  See Sepulveda II, 55 A.3d at 1139.

For the foregoing reasons, the Court concludes that the supreme court's disposition of these claims did not result in a decision contrary to, or involve an unreasonable application of, clearly established federal law and did not result in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  See 28 U.S.C. § 2254(d).  Accordingly, the Court will deny Sepulveda's fourth ground for relief.

### E.    Claim V - Trial Counsel's Failure to Challenge the Admission and Voluntariness of Sepulveda's Inculpatory Statements

Sepulveda makes a claim of ineffective assistance of counsel based on trial counsel's failure to develop evidence that Sepulveda's waiver of his Miranda rights was not knowing,

intelligent and voluntary and that his inculpatory statements were involuntary.  (Doc. No. 31
¶¶ 152-181); see Miranda v. Arizona, 384 U.S. 436, 479 (1966).  This claim has been exhausted.
See Sepulveda II, 55 A.3d at 1135-37.

### 1.      Factual and Procedural Background

 Sepulveda was taken into custody after police responded to the crime scene at
approximately 12:20 a.m. on November 26, 2001.  (Doc. No. 59-7 at 76-79.)  Trooper Tretter
handcuffed Sepulveda and placed him in the back of a patrol car.  (Id. at 79.)  Believing there
was a domestic violence incident in progress, Tretter asked where the woman was, to which
Sepulveda responded:  "[T]here is no she.  They are in the basement.  I shot them."  (Id. at 80.)
Sepulveda remained in the patrol car until he was transported to the Lehighton Barracks at
approximately 3:00 a.m.  (Id. at 110-11.)

At approximately 3:50 a.m., Trooper Sommers and Corporal McAndrew gave Sepulveda
Miranda warnings.  (Doc. No. 59-45 at 51-52.)  Sepulveda signed a rights waiver form, and
Sommers and McAndrew began to interview him.  (Id. at 52-53.)  At approximately 5:04 a.m.,
Sepulveda began a tape-recorded statement, which lasted until 6:00 a.m.  (Id. at 53-55.)  In this
statement, Sepulveda admitted that he shot both Mendez and Lopez twice and that he and Heleva
dragged Mendez back inside the house, where Sepulveda struck Mendez in the head with an ax
handle.  (Doc. No. 64-26 at 9-15.)

After making the recorded statement, Sepulveda was asked if he needed anything and
was given coffee and a blanket because he indicated that he was cold.  (Doc. No. 59-45 at 43-44,
56-57.)  A break in the questioning occurred for about an hour while Sommers and McAndrew
conferred with other investigators.  (Id. at 57-58.)  When they returned, McAndrew told
Sepulveda that he did not believe he was being truthful due to conflicting information from other

witnesses.  (Id. at 58.)  At approximately 7:10 a.m., Sepulveda asked to speak to McAndrew

alone.  (Id. at 58-59.)  Sepulveda then recounted a different version of the events, which

McAndrew asked him to reduce to writing.  (Id. at 59-60.)  After McAndrew reexplained his

Miranda rights, Sepulveda prepared a written statement from 7:55 a.m. to 8:50 a.m.  (Id. at 61-

62, Doc. No. 64-28.)  In this statement, Sepulveda claimed that he shot Lopez only once and that

it was Heleva who struck Mendez in the head with the ax handle.  (Doc. No. 64-28 at 4-5.)

Before trial, Anders filed a motion to suppress, claiming that the statements Sepulveda

made after he asked to speak to McAndrew alone were elicited in violation of Commonwealth v.

Davenport, 370 A.2d 301, 306 (Pa. 1977), which held that any statements obtained after arrest

but before arraignment would not be admissible at trial if the accused was not arraigned within

six hours of arrest.  (Doc. No. 59-44 at 2-3.)  Following an evidentiary hearing, the trial court

denied the motion.  (Doc. No. 59-46 at 12-17.)

On direct appeal, Sepulveda claimed that the trial court erred by denying the motion to

suppress.  See Sepulveda I, 855 A.2d at 789.[9]  The Pennsylvania Supreme Court held that

Sepulveda failed to demonstrate prejudice, given that his testimony at trial was similar to his

statement to McAndrew in all material respects.  See id. at 789.  The supreme court also

concluded that the statement was properly admitted at trial.  See id. at 790.  The court noted that

it had recently abandoned the six-hour rule of Davenport, 370 A.2d at 306, holding instead that

courts should look to the totality of the circumstances to determine whether a pre-arraignment

statement was freely and voluntarily made and therefore admissible.  See id. at 792-93 (citing

---

[9]  Anders had also moved to suppress the statement Sepulveda made in the patrol car before he
was given Miranda warnings and pursued that claim on direct appeal.  See Sepulveda I, 855 A.2d
at 789.  Sepulveda has made no claim regarding the statement in the patrol car in the instant
amended petition.

Commonwealth v. Perez, 845 A.2d 779, 787 (Pa. 2004)).  Applying that test, the supreme court concluded that the totality of the circumstances demonstrated that Sepulveda's statement to McAndrew was voluntarily given and therefore properly admitted at trial:

> In the first instance, there is nothing in the record to indicate that the delay in [Sepulveda]'s arraignment was aimed at overcoming [his] will, or that the police utilized any coercive tactics to persuade him to give a statement.  At trial, Corporal McAndrew testified to the circumstances surrounding [Sepulveda]'s confession and indicated that [Sepulveda] was informed of his constitutional rights before he spoke to the officers, was permitted to use the bathroom and was given coffee and a blanket during the interview, and was not injured or under the influence of drugs or alcohol when he made the confession.   Moreover, the record shows that [Sepulveda] himself was responsible for part of the delay as he spent the first hours of the interview providing a statement that he later partially recanted in the follow-up statement at issue here.  Under these circumstances, we find that [Sepulveda]'s statement to Corporal McAndrew was voluntarily given and therefore admissible[.]

See id. at 793 (citations omitted).

In his PCRA petition, Sepulveda claimed that Anders was ineffective in three respects: (1) he failed to investigate, develop and present evidence that Sepulveda was incapable of making a knowing, intelligent and voluntary waiver of his Miranda rights; (2) he failed to develop or argue evidence of police coercion; and (3) he failed to present evidence of voluntariness at trial and failed to request that the jury be instructed to decide whether Sepulveda's statements should be disregarded because they were involuntary.  (Doc. 59-19 at 80-87.)  Sepulveda alleged that a proper investigation would have produced evidence that he suffered from intellectual and cognitive impairments of a type that impact the ability to make a valid waiver of Miranda rights, which were further exacerbated by drug intoxication or withdrawal and extreme paranoia and delusion resulting from cocaine-induced psychosis.  (Id. at 83-86.)  Sepulveda also alleged that Anders could have shown that the statements were not voluntary because the conditions of the interrogation combined with his cognitive and emotional

impairments and drug use and withdrawal rendered him incapable of resisting police coercion. (Id. at 86-87.)

At the PCRA court hearing, Anders testified that he did not argue the voluntariness of Sepulveda's statement to the jury because Sepulveda was going to testify that he shot the two victims, which was consistent with his statements. (Doc. No. 59-14 at 52-53.) Sepulveda also presented evidence concerning his intellectual and cognitive deficits and his drug use, including on the night of the homicides, as already described in Section III.B.1, supra.

The PCRA court denied relief, concluding that Anders was not ineffective because the underlying claims lacked merit. (Doc. 59-37 at 46.) The PCRA court found that Sepulveda "failed to establish that he was under the influence of drugs or alcohol, or that he was suffering from any cognitive mental deficits, that affected his ability to knowingly, intelligently and voluntarily waive his Miranda rights or affect the voluntariness of his statements." (Id. at 45.) The PCRA court based this finding in part on McAndrew's testimony that Sepulveda stated that he was not under the influence of any drugs or alcohol when the statements were made. (Id. at 43-44.) The PCRA court also relied on a Monroe County Correctional Facility ("MCCF") report prepared when Sepulveda was first incarcerated, which indicated that he was not under the influence of or withdrawing from drugs or alcohol or taking medication, and an MCCF report of observation of Sepulveda over the next four days, which reflected no signs of drug or alcohol withdrawal. (Id. at 44.) The PCRA court also found that Sepulveda "was not subject to police coercion prior to making his statements to the police," based on McAndrew's testimony that he gave Sepulveda bathroom breaks and coffee and removed his handcuffs. (Id. at 45-46.)

The Pennsylvania Supreme Court affirmed the PCRA court's denial of relief. See Sepulveda II, 55 A.3d at 1135-37. The supreme court first stated that it understood Sepulveda's

<u>Miranda</u> claim as having two components: (1) the waiver was not voluntary because the conditions of Sepulveda's custody and his mental status rendered the waiver coercive as a matter of law; and (2) the waiver was not knowing and intelligent because Sepulveda's mental status or diminished capacity "interfered with his ability to have a full understanding of the nature of the right being abandoned and the consequence of the choice." <u>See</u> <u>id.</u> at 1136 (citation omitted). With respect to the voluntariness of both the waiver and Sepulveda's confession, the supreme court concluded that the PCRA court's finding that there was no evidence of police coercion was supported by the record and the supreme court's prior determination on direct appeal. <u>See</u> <u>id.</u> at 1137 (citing <u>Sepulveda I</u>, 855 A.2d at 793). With respect to the claim that the <u>Miranda</u> waiver was not knowing and intelligent, the supreme court reasoned as follows:

> We also discern no error in the PCRA court's finding that there was no obvious objective indication to counsel, state police, or the trial court that [Sepulveda] suffered from any mental illness at the time he confessed his crimes, such that the police conduct can be viewed as unconstitutional manipulation warranting suppression. As in [<u>Commonwealth v. Mitchell</u>, 902 A.2d 430 (Pa. 2006)] and [<u>Commonwealth v. Logan</u>, 549 A.2d 531 (1988)], the facts surrounding the confession do not suggest that [Sepulveda]'s alleged mental status interfered with the important, but simple (all he needs say is "no") choice of whether to waive his constitutional rights. Furthermore, Dr. Puente testified that there was nothing to suggest that the crime was a result of cocaine-induced psychosis and the confessions took place immediately following the crimes. Thus, counsel had no reason to believe that [Sepulveda] suffered from a mental defect at the time of his confession that was or should have been obvious to police, nor, for that matter, does the evidence suggest that [Sepulveda]'s alleged mental health issues interfered with his waiver. Accordingly, [Sepulveda] is not entitled to relief on this claim.

<u>See</u> <u>id.</u> at 1137.

### 2.    Legal Standard

The admission at trial of an involuntary confession violates the defendant's right to due process. <u>See</u> <u>Miller v. Fenton</u>, 474 U.S. 104, 109-10 (1985). A confession is not voluntary if police obtained it through coercive means. <u>See</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).

The assessment of voluntariness requires courts to consider the "totality of circumstances," including not only "the crucial element of police coercion," but also the length, location, and continuity of the interrogation, as well as the defendant's maturity, education, physical condition, and mental health.  See Withrow v. Williams, 507 U.S. 680, 693 (1993) (citations omitted).

Statements made by a defendant during a custodial interrogation are admissible at trial only if the prosecution proves, by a preponderance of the evidence, that the defendant validly waived his Miranda rights.  See Connelly, 479 U.S. at 168.  A valid Miranda waiver has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

See Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)).  "[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"  Edwards v. Arizona, 451 U.S. 477, 483 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).

### 3.     Analysis

Sepulveda contends that the supreme court unreasonably applied Edwards, 451 U.S. at 483, because it only addressed whether his Miranda waiver was voluntary and failed to separately assess whether it was knowing and intelligent.  (Doc. No. 42 at 90.)  The Court concludes that this contention is without merit.  In its decision affirming the PCRA court's denial

of relief, the supreme court identified the separate components of Sepulveda's claim, as well as the "two-prong analysis" required to assess the validity of a defendant's waiver of his <u>Miranda</u> rights.  <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1136 (citing <u>Commonwealth v. Mitchell</u>, 902 A.2d 430, 451 (2006)).  The supreme court thereafter addressed both components in analyzing Sepulveda's ineffective assistance of counsel claim.  <u>See</u> <u>id.</u> at 1137.  Therefore, the Court concludes that the supreme court did not unreasonably apply <u>Edwards</u>, 451 U.S. at 483.

Sepulveda also contends that the supreme court unreasonably applied <u>Wiggins v. Smith</u>, 539 U.S. 510, 527 (2003), by finding that Anders was not ineffective without considering his obligation to conduct a reasonable investigation.  (Doc. No. 42 at 88-89) (citing <u>Sepulveda II</u>, 55 A.3d at 1137).  The statement at issue appears in a discussion that seems intended to explain why the supreme court finds that the evidence did not show either police coercion or that Sepulveda's mental health issues prevented a knowing and intelligent waiver of his <u>Miranda</u> rights.  <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1137.  In the course of that discussion, the supreme court cites Dr. Puente's testimony in the PCRA court and twice refers to the absence of evidence that Sepulveda's alleged mental status or mental health issues interfered with his waiver.  <u>See</u> <u>id.</u>  In addition, the supreme court compares the facts of Sepulveda's case to those in <u>Logan</u>, 549 A.2d 531, which rejected a claim "that counsel was ineffective for failing to employ psychiatric testimony at the suppression hearing to demonstrate that his mental illness prevented a proper waiver."  <u>See</u> <u>id.</u> at 537-38.  In view of the supreme court's explicit reliance on the expert evidence Sepulveda presented in the PCRA court and its focus on the effect of Sepulveda's mental status on his waiver, the Court concludes that the supreme court considered the evidence that would have been produced if Anders had conducted a reasonable investigation.  Therefore,

the Court concludes that the supreme court's decision is not based on an unreasonable application of Wiggins, 539 U.S. at 527.

For the foregoing reasons, the Court concludes that the supreme court's disposition of this claim did not result in a decision contrary to, or involve an unreasonable application of, clearly established federal law and did not result in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  See 28 U.S.C. § 2254(d).  Accordingly, the Court will deny Sepulveda's fifth ground for relief.

### F.    Claim VI - Prosecution's Discriminatory Use of Peremptory Challenges and Counsel's Failure to Properly Litigate Batson and J.E.B. Claims

Sepulveda claims that the prosecution used peremptory challenges in a discriminatory manner against the only prospective juror with a Latino surname and against female prospective jurors, in violation of Batson v. Kentucky, 476 U.S. 79 (1986), and J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994).  (Doc. No. 31 ¶¶ 182-196.)  He also makes a claim of ineffective assistance of counsel based on the failure of his trial and appellate counsel to properly litigate the Batson and J.E.B. claims.  (Id. ¶¶ 197-203.)  These claims have been exhausted.  See Sepulveda II, 55 A.3d at 1131-34.

#### 1.    Factual and Procedural Background

Sepulveda claims that he established a prima facie case of racial discrimination by showing that the prosecutor used a peremptory challenge to strike the only prospective juror with a Latino surname who survived cause challenges, with no apparent race-neutral reason for the strike.  (Doc. No. 31 ¶¶ 193-196.)  Sepulveda claims that he established a prima facie case of gender discrimination by showing that the prosecutor used peremptory challenges to exclude nine (9) of the fifteen (15) women he had a chance to strike, for a strike rate of sixty (60) percent, while excluding only four (4) of the twenty (20) men he had the chance to strike, for a strike rate

of twenty (20) percent.  (Id. ¶¶ 187-189.)  Sepulveda claims that he proved violations of Batson and J.E.B. because the prosecutor failed to articulate race-neutral or gender-neutral explanations in response to the prima facie case.  (Id. ¶¶ 191, 196.)

Sepulveda did not object at trial to the prosecutor's use of peremptory challenges or raise his Batson or J.E.B. claims on direct appeal.  See Sepulveda II, 55 A.3d at 1133.  Sepulveda made those claims for the first time in his PCRA petition, where he also claimed that his trial and appellate counsel were ineffective for failing to litigate the Batson and J.E.B. claims at trial and on direct appeal.  (Doc. 59-19 at 96-102.)  Sepulveda sought discovery of documents regarding jury selection in his case and in other cases prosecuted by the Monroe County District Attorney's office, which the PCRA court denied.  (Doc. Nos. 59-51 at 10-11, 59-24 at 6-7.)  At the conclusion of the PCRA court hearing, Sepulveda's counsel stated that they would not be calling witnesses regarding the Batson claim because they could not do so without the requested discovery.  (Doc. No. 59-17 at 60.)

The PCRA court found that Sepulveda waived the substantive Batson and J.E.B. claims by failing to raise them at trial or on direct appeal but addressed the merits of the claims for the purpose of deciding the ineffective assistance of counsel claim.  (Doc. No. 59-37 at 12-13.)  The PCRA court concluded that Sepulveda had not established a prima facie case of purposeful discrimination against the prospective juror with a Latino surname, based on the absence of any supporting record from the trial court at the time of jury selection and the court's conclusion that nothing in the prosecutor's questions to the prospective juror indicated any type of racial bias. (Id. at 15.)  The court found that the prosecutor's exercise of peremptory challenges against the female prospective jurors was gender-neutral because the voir dire transcript revealed no apparent gender bias against the excluded prospective jurors and showed gender-neutral reasons

upon which the prosecutor could have based his strikes.  (Id. at 16 & n.6.)  Having found that the underlying Batson and J.E.B. claims lacked merit, the PCRA court concluded that Sepulveda could not establish ineffective assistance of counsel for failure to pursue the claims.  (Id.)

The Pennsylvania Supreme Court affirmed the PCRA court's denial of relief.  See Sepulveda II, 55 A.3d at 1131-34.  The supreme court first concluded that Sepulveda waived the substantive Batson and J.E.B. claims because he did not raise them at trial.  See id. at 1131.  The court then analyzed the merits of the claims under Commonwealth Uderra, 862 A.2d 74 (Pa. 2004), for the purpose of addressing the ineffective assistance of counsel claim.  See Sepulveda II, 55 A.3d at 1132-33.  In Uderra, the supreme court held that a PCRA petitioner who makes no Batson objection during jury selection may not rely on a prima facie case under Batson, but instead "must prove actual, purposeful discrimination by a preponderance of the evidence . . . in addition to all other requirements essential to overcome the waiver of the underlying claim."  See id. at 1132 (citing Uderra, 862 A.2d at 87).  Applying this standard, the supreme court held that the record supported the PCRA court's conclusion that there was no indication of purposeful discrimination.  See Sepulveda II, 55 A.3d at 1132-33.

## 2.    Legal Standard

A prosecutor's use of peremptory challenges to discriminate on the basis of race or gender violates the  Equal Protection Clause of the Fourteenth Amendment.  See Batson, 476 U.S. at 89; J.E.B., 511 U.S. at 146.  Batson claims are analyzed under a three-part burden shifting framework:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.  Third, if a race-neutral explanation is tendered, the

> trial court must then decide . . . whether the opponent of the strike has proved
> purposeful racial discrimination.

See Johnson v. California, 545 U.S. 162, 168 (2005) (citation, quotation marks, and brackets omitted).  A defendant "satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  See id. at 170.  The Third Circuit Court of Appeals has identified five factors that are generally relevant to this inquiry: (1) the number of racial group members in the panel; (2) the nature of the crime; (3) the race of the defendant; (4) a pattern of strikes against racial group members; and (5) the questions and statements during the voir dire.  See Holloway v. Horn, 355 F.3d 707, 722 (3d Cir. 2004) (citation omitted).  In cases involving claims of gender discrimination under J.E.B., these same factors are relevant, considering gender in place of race.  See Copenhefer v. Horn, 696 F.3d 377, 391 (3d Cir. 2012) (citation omitted).

A timely objection to a prosecutor's use of peremptory challenges during jury selection is a prerequisite to raising a Batson claim.  See Clausell v. Sherrer, 594 F.3d 191, 194-95 (3d Cir. 2010); Lewis, 581 F.3d at 101-02; Abu-Jamal v. Horn, 520 F.3d 272, 284 (3d Cir. 2008), vacated on other grounds sub nom. Beard v. Abu-Jamal, 558 U.S. 1143 (2010).  A defendant who fails to make a timely objection has forfeited federal habeas review of a Batson claim.  See Clausell, 594 F.3d at 194-95; Lewis, 581 F.3d at 102; Abu-Jamal, 520 F.3d at 284.

### 3.    Analysis

The Court will first address Sepulveda's substantive Batson and J.E.B. claims.  The Third Circuit Court of Appeals has held that "the existence of a timely objection to the use of peremptory challenges is not merely a matter of state procedural law," but instead is required to preserve a Batson claim for federal habeas review.  See Lewis, 581 F.3d at 102 (citing Abu-Jamal, 520 F.3d at 284).  Because Sepulveda did not make a timely objection, the Court

concludes that he has forfeited federal habeas review of his substantive Batson and J.E.B. claims. For that reason, the Court will deny relief on those claims.

The Court will next address Sepulveda's claim that his counsel was ineffective for failing to raise the Batson and J.E.B. claims at trial and on direct appeal. Sepulveda argues that the supreme court's denial of relief under Uderra, 862 A.2d at 87, is contrary to clearly established federal law because it imposed a more exacting standard than the Batson framework. (Doc. No. 42 at 97-98.) The Third Circuit recently addressed a similar claim in Hutchinson v. Superintendent Greene SCI, 860 F. App'x 246 (3d Cir. 2021) (unpublished). The petitioner in that case claimed that his trial and direct appeal counsel were ineffective for failing to challenge the prosecutor's discriminatory use of peremptory strikes. See id. at 248. The Pennsylvania Supreme Court denied relief based on Uderra, 862 A.2d at 87, because the petitioner failed to prove actual, purposeful discrimination, which the petitioner claimed was an unreasonable application of Batson. See id. (citing Commonwealth v. Hutchinson, 25 A.3d 277, 287 (Pa. 2011)). The Third Circuit concluded that it was unnecessary to address the Uderra rule because, even assuming that the supreme court's decision involved an unreasonable application of Batson, the petitioner's claim failed under de novo review because he failed to demonstrate Strickland prejudice. See id. at 248-49. The Third Circuit found no merit in the petitioner's contention that he was not required to show Strickland prejudice because a successful Batson claim would establish structural error. See id. at 249. The Third Circuit then concluded that, given the overwhelming evidence of guilt, the alleged deficient performance of counsel did not have a reasonable probability of affecting the outcome. See id.

The Court concludes that it is unnecessary to address whether the supreme court's denial of relief based on Uderra, 862 A.2d at 87, is contrary to or an unreasonable application of

60

Batson.  Instead, as in Hutchinson, 860 F. App'x 246, the Court finds on de novo review that Sepulveda's ineffective assistance of counsel claim fails because he has not established prejudice.  See Strickland, 466 U.S. at 697.  Sepulveda asserts that he was prejudiced because it is reasonably likely that he would have been acquitted had counsel performed effectively.  (Doc. No. 42 at 96.)  The Court does not agree.  Sepulveda admitted to shooting both victims and to helping Heleva push Mendez back into the house after he had fled and sought help from a neighboring house.  Sepulveda's imperfect defense of others theory had little likelihood of success given the circumstances of the homicides and his role in continuing and escalating the confrontation.  Upon review of the totality of the evidence in this case, the Court concludes Sepulveda has not demonstrated a reasonable probability that the result of his trial would have been different had his trial counsel objected to the prosecutor's peremptory challenges.  Therefore, his ineffective assistance of trial counsel claim fails on de novo review.  The Court also concludes that Sepulveda has failed to show ineffective assistance of appellate counsel because he has not demonstrated that, despite the absence of an objection at trial, there is a reasonable probability that the Batson and J.E.B. claims would have succeeded on direct appeal.

The Court will also deny Sepulveda's request for an evidentiary hearing to further develop his Batson and J.E.B. claims.  (Doc. 42 at 100-01.)  In deciding whether to grant an evidentiary hearing, "a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  See Schriro v. Landrigan, 550 U.S. 465, 474 (2007).  A district court is not required to hold an evidentiary hearing "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief."  See id.  For the reasons already discussed, the Court has concluded that habeas relief is precluded because Sepulveda forfeited federal habeas

review of his substantive <u>Batson</u> and <u>J.E.B.</u> claims and failed to establish <u>Strickland</u> prejudice. Based on this disposition of the claims, the Court concludes that an evidentiary hearing could not enable Sepulveda to prove factual allegations that, if true, would entitle him to relief.  <u>See id.</u> at 474.  Accordingly, the Court will deny Sepulveda's request for an evidentiary hearing.

For the foregoing reasons, the Court will deny Sepulveda's sixth ground for relief.

### G.    Claim VII - Defense Counsel's Undisclosed Conflict of Interest

Sepulveda claims that he was denied his right to effective assistance of counsel because his counsel represented the trial prosecutor in Sepulveda's case while also representing Sepulveda on direct appeal.  (Doc. No. 31 ¶¶ 204-218.)  This claim has been exhausted.  <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1145-48.

#### 1.    Factual and Procedural Background

Sepulveda was represented by Anders and Schurdak on direct appeal.  <u>See</u> <u>Sepulveda I</u>, 855 A.2d at 785.  They filed Sepulveda's opening appellate brief on May 5, 2003, followed by his reply brief on June 18, 2003.  (Doc. No. 64-4 at 2.)  Schurdak argued the appeal on December 4, 2003.  (<u>Id.</u>)  On August 19, 2004, the Pennsylvania Supreme Court issued its decision affirming Sepulveda's convictions and death sentences.  <u>See</u> <u>Sepulveda I</u>, 855 A.2d at 783.

In early November 2003, Monroe County District Attorney Pazuhanich, the trial prosecutor in Sepulveda's case, was elected to the Court of Common Pleas of Monroe County. <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1145.  On November 29, 2003, he was arrested in Luzerne County on charges unrelated to his duties as a prosecutor involving the indecent assault of a child.  <u>See</u> <u>id.</u>  Anders and Schurdak undertook the representation of Pazuhanich five days before the argument in Sepulveda's direct appeal.  <u>See id.</u> at 1145, 1147 n.34; (Doc. No. 59-14 at 34-35). Anders and Schurdak met with Pazuhanich and conducted some preliminary investigation before

being replaced by other counsel until a later point in the case.  See Sepulveda II, 55 A.3d at 1145; (Doc. No. 59-14 at 34-35).

On January 5, 2004, Pazuhanich was sworn in by a notary public as Judge of the Court of Common Pleas of Monroe County and was placed on administrative suspension shortly thereafter.  See Sepulveda II, 55 A.3d at 1145.  On July 12, 2004, Pazuhanich pleaded nolo contendere in the Luzerne County Court of Common Pleas to several charges and was sentenced to ten years' probation and directed to register pursuant to Megan's Law.  See id. (citing Pa. Cons. Stat. § 9791 et seq.).  On October 1, 2004, Pazuhanich was removed from the bench by the Court of Judicial Discipline.  See id.  Anders returned to represent Pazuhanich in the guilty plea process and in the judicial disciplinary proceedings.  See id.  Anders did not at any point advise Sepulveda that he was representing Pazuhanich.  See id. at 1145-46; (Doc. No. 59-14 at 35-36).

In his PCRA petition, Sepulveda claimed that he was denied his right to effective assistance of counsel due to Anders' undisclosed conflict of interest.  (Doc. No. 59-19 at 68-73.) The PCRA court denied relief on the claim, finding that no conflict of interest existed because Anders' simultaneous representation of Pazuhanich and Sepulveda "involved totally unrelated matters and the representation of one did not adversely affect the representation of the other" and that "there was no significant risk that the representation of Pazuhanich would materially limit Anders' responsibilities to [Sepulveda] in his direct appeal."  (Doc. No. 59-37 at 65-66.)

The Pennsylvania Supreme Court affirmed the PCRA court's denial of relief.  See Sepulveda II, 55 A.3d at 1145-48.  The supreme court first identified the applicable standard, stating that prejudice is presumed if counsel is burdened by an "actual" conflict, which requires a petitioner to demonstrate that: (1) counsel actively represented conflicting interests; and (2) those conflicting interests adversely affected his lawyer's performance.  See id. at 1147 (citation and

quotation marks omitted).  The supreme court noted that Anders' representation of Pazuhanich did not begin until after Sepulveda's direct appeal issues were already determined and briefed. See id. at 1147.  While recognizing that Anders' representation of Pazuhanich was "troubling" and should have been disclosed to Sepulveda, the court concluded that the mere existence of the overlap in representation did not prove that Anders' representation of Pazuhanich adversely affected Sepulveda's interests, as required to establish an actual conflict of interest.  See id.  The court further concluded that Sepulveda had not shown an adverse effect on the basis that Anders could have used information about Pazuhanich's arrest in Sepulveda's direct appeal to show that Pazuhanich was biased against female jurors or biased against Sepulveda because he was a drug dealer.  See id. at 1147-48.

### 2.    Legal Standard

A criminal defendant is denied his Sixth Amendment right to effective assistance of counsel if his lawyer "actively represented conflicting interests" and "an actual conflict of interest adversely affected his lawyer's performance."  See Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).  If a defendant makes that showing, prejudice is presumed.  See Strickland, 466 U.S. at 692.  To establish that a conflict of interest adversely affected his lawyer's performance, a defendant must show that "some plausible alternative defense strategy or tactic might have been pursued" that "was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  See United States v. Gambino, 864 F.2d 1064, 1070 (3d Cir. 1988) (citation and quotation marks omitted).  The Supreme Court has recognized a limited automatic reversal rule, which does not require the defendant to show that his counsel's performance was adversely affected, in cases where the trial court improperly required joint representation over

objection.  See Mickens v. Taylor, 535 U.S. 162, 173-74 (2002) (citing Holloway v. Alabama, 435 U.S. 475, 487-91 (1978)).

### 3.    Analysis

Sepulveda contends that, due to Anders' failure to disclose the conflict, he was not required to show an actual effect on the defense in order to receive relief and therefore the supreme court's decision was both contrary to and an unreasonable application of Strickland, Cuyler, and Holloway.  (Doc. No. 42 at 106-07.)  Sepulveda does not identify a Supreme Court decision holding that the automatic reversal rule applies in these circumstances.  See (Doc. No. 42 at 102-107).  In Holloway, the Court held that automatic reversal is required when a trial court improperly requires joint representation over timely objection.  See Holloway, 435 U.S. at 488.  However, the Court has declined to extend this rule beyond cases "in which (as in Holloway) counsel protested his ability to simultaneously represent multiple defendants."  See Mickens, 535 U.S. at 173.  Absent objection at trial, a defendant is entitled to reversal only if he demonstrates that "an actual conflict of interest adversely affected his lawyer's performance."  See Cuyler, 446 U.S. at 348-49.  The Court concludes that the supreme court's holding that Sepulveda was not entitled to relief without showing that an actual conflict of interest adversely affected his counsel's performance is not contrary to this clearly established federal law.

The Court further concludes that the supreme court did not unreasonably apply clearly established federal law by finding that Sepulveda failed to show the required adverse effect. Sepulveda does not specify how any information about the circumstances underlying Pazuhanich's arrest could have been used at the point Anders began to represent Pazuhanich, five days before oral argument in Sepulveda's appeal and after the appeal had been fully briefed. See (Doc. No. 42 at 106-07).  Accordingly, the Court concludes that it was reasonable for the

supreme court to deny relief on the ground that Sepulveda did not identify any plausible alternative defense strategy that Anders could have pursued that was inherently in conflict with or not undertaken due to Anders' loyalty to Pazuhanich.  See Sepulveda II, 55 A.3d at 1147-48.

For the foregoing reasons, the Court concludes that the supreme court's disposition of this claim did not result in a decision contrary to, or involve an unreasonable application of, clearly established federal law and did not result in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  See 28 U.S.C. § 2254(d).  Accordingly, the Court will deny Sepulveda's seventh ground for relief.

### H.      Claim VIII – Trial Counsel's Failure to Object to Victim Impact Evidence

Sepulveda claims ineffective assistance of counsel based on Anders' failure to object to victim impact evidence or to request a curative instruction concerning that evidence.  (Doc. No. 31 ¶¶ 219-235.)  This claim has been exhausted.  See Sepulveda II, 55 A.3d at 1139-40.

### 1.      Factual and Procedural Background

Sepulveda alleges that Anders failed to object to two instances in which the jury was invited to base its decision on sympathy for the victims.  First, he claims that Anders failed to object or request a curative instruction when Dawn Mendez, the sister of victim John Mendez, testified that her brother had a gold cross and guardian angel keychain in his possession when she last saw him, after which those items were admitted into evidence.  (Doc. Nos. 31 ¶¶ 223-225, 59-7 at 55-57.)  Second, Sepulveda claims that Anders failed to object when members of the victims' families carried photographs of the victims into the courtroom.  (Doc. No. 31 ¶¶ 229-230.)  To establish that this occurred, he relies on a local newspaper article, which he claims featured a photograph with the following caption:

> Relatives of murder victims John Joseph Mendez, 19, and Ricardo "Cano" Lopez
> Jr. of New York City carried pictures of their loved [ ] into court.  At right is

> Deborah Murphy, mother of Mendez with a picture of her son.  At left is Daisy Hidalgo, Lopez' aunt with a picture of Lopez.  Pictured at left rear is Elbin Flores with a picture of his nephew, Ricardo Lopez.

(Id. ¶ 230) (citing William Doolittle, "Sepulveda Jury Decides Quickly: He's Guilty," *The Pocono Record* (Nov. 23, 2002)).

Sepulveda raised these ineffective assistance of counsel claims in his PCRA petition. (Doc. No. 59-19 at 111-13, 116-17.)  The PCRA court concluded that Anders was not ineffective for failing to object to the evidence offered through Dawn Mendez because it "was relevant for purposes of identifying the decedent through personal items found at the scene," and, even if irrelevant to the issue of guilt, "its probative value was not outweighed by its prejudicial effect." (Doc. No. 59-37 at 48-49.)  The PCRA court further concluded that, even if the claim was meritorious, Sepulveda did not demonstrate that he was prejudiced.  (Id. at 49-50.)  With respect to the victims' photographs, the PCRA court found that Sepulveda had not established the factual predicate of the claim.  (Id. at 49.)  The court noted that Sepulveda did not produce the newspaper article he relied on or point to any evidence in the record showing that the photographs were present in the courtroom.  (Id.)  In addition, the PCRA court judge (who was also the trial court judge) relied on his own recollection of the trial: "This court clearly recalls that no such extra-record victim impact evidence was present in the courtroom during either phase of [Sepulveda]'s trial and such evidence would not have been permitted.  Had a family member attempted to bring such evidence into the courtroom, it would have immediately been removed."  (Id.)

The Pennsylvania Supreme Court affirmed the PCRA court's denial of relief.  See Sepulveda II, 55 A.3d at 1140.  The court held that the cross and keychain were properly admitted to establish identity and also noted that Sepulveda did not suggest that the evidence

introduced for this purpose was actually argued as victim impact evidence.  <u>See</u> <u>id.</u>  Because the underlying claim lacked a factual predicate, the court concluded that the claim of ineffectiveness was necessarily frivolous.  <u>See</u> <u>id.</u>  The court found that Sepulveda failed to prove the photographs of the victims were ever brought into the courtroom, noting that the newspaper article he relied on was hearsay and in any event was contradicted by the trial judge's recollection.  <u>See</u> <u>id.</u>  Because the underlying claim was baseless, the court concluded that counsel could not be deemed ineffective.  <u>See</u> <u>id.</u>

### 2.    Analysis

The Court will first address the claim based on Anders' failure to object to the testimony of Dawn Mendez at trial.  The Court finds that it is unnecessary to address deficient performance because the claim can be disposed of based on the <u>Strickland</u> prejudice prong.  <u>See</u> <u>Strickland</u>, 466 U.S. at 697.  Although the Pennsylvania Supreme Court did not explicitly discuss prejudice, the issue was addressed by the PCRA court.  <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1139-40; (Doc. No. 59-37 at 49-50).  "Section 2254(d) deference applies to any claim that has been adjudicated on the merits in any state court proceeding, which 'can occur at any level of state court' as long as the state court's resolution has preclusive effect."  <u>Collins v. Sec'y of Penn. Dep't of Corr.</u>, 742 F.3d 528, 545 (3d Cir. 2014) (quoting <u>Thomas v. Horn</u>, 570 F.3d 105, 117 (3d Cir. 2009)).  Where, as here, the supreme court did not question or undermine a PCRA court's finding of no <u>Strickland</u> prejudice, AEDPA requires deference to that finding.  <u>See</u> <u>id.</u> at 546.

The Court concludes that the PCRA court reasonably applied the <u>Strickland</u> standard by finding that Sepulveda was not prejudiced by Anders' failure to object to the testimony of Dawn Mendez regarding the gold cross and guardian angel keychain.  (Doc. No. 59-37 at 49-50.)  Upon review of the totality of the evidence in this case, the Court concludes that there is no reasonable

probability that the result of Sepulveda's trial would have been different had Anders objected to that testimony.  As already discussed, Sepulveda admitted to shooting both victims and to helping Heleva push Mendez back into the house after he had fled.  Sepulveda's imperfect defense of others theory had little likelihood of success given the circumstances of the homicides and his role in continuing and escalating the confrontation.  Accordingly, the Court finds that the PCRA court reasonably concluded that Sepulveda failed to establish <u>Strickland</u> prejudice.

The Court will next address Sepulveda's claim concerning the display of the victims' photographs.  Sepulveda contends that the supreme court's decision is based on an unreasonable determination of the facts, but he does not offer any supporting analysis or identify any evidence in the record that refutes the trial judge's recollection that the victims' photographs were not brought into the courtroom or seen by the jury.  <u>See</u> (Doc. No. 42 at 111).  Consequently, the Court concludes that the supreme court did not unreasonably determine that Sepulveda failed to prove that the photographs were displayed in the courtroom.  <u>See</u> <u>Sepulveda II</u>, 55 A.3d at 1140.

For the foregoing reasons, the Court concludes that the state courts' disposition of this claim did not result in a decision contrary to, or involve an unreasonable application of, clearly established federal law and did not result in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  <u>See</u> 28 U.S.C. § 2254(d).  Accordingly, the Court will deny Sepulveda's eighth ground for relief.

## I.      Claim IX - Lack of Transcript of Portions of Trial

 Sepulveda has withdrawn this claim, which concerns the failure to transcribe side-bar discussions.  (Doc. Nos. 31 ¶¶ 236-244, 42 at 107.)  Therefore, it is unnecessary for the Court to address the ninth claim for relief.

J.       **Claim X - Cumulative Prejudicial Effect of All Errors**

Sepulveda claims that, even if he is not entitled to relief on any individual claim, the cumulative effect of all the errors alleged in his petition denied him a fair trial.  (Doc. No. 31 ¶¶ 245-248.)  This claim has been exhausted.  See Sepulveda II, 55 A.3d at 1150-51.

The Pennsylvania Supreme Court denied relief on the basis of cumulative error, noting that it had cited a lack of prejudice in rejecting only two of Sepulveda's ineffective assistance of counsel claims: (1) for failure to present evidence in support of the imperfect defense of others theory; (2) as an alternative ground for denying the claim relating to the self-defense jury instruction.  See id.  The court concluded that the cumulative error claim did not warrant relief because the two claims "involve entirely disparate inquiries" and, even cumulating the claims, "we have no doubt that the outcome of the guilt phase proceedings would have been the same given the overwhelming evidence of guilt, including [Sepulveda]'s several confessions to the police."  See id. at 1151.

"Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process."  Fahy, 516 F.3d at 205 (citation omitted).  "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief unless he can establish 'actual prejudice.'"  Albrecht, 485 F.3d at 139 (quoting Brecht, 507 U.S. at 637).

Sepulveda contends that the supreme court unreasonably applied Strickland and its progeny by considering evidence of his guilt in denying relief on his cumulative error claim.  (Doc. No. 42 at 115.)  The Court concludes that this contention is without merit.  A claim that a petitioner was denied a fair trial by reason of the cumulative effect of errors at trial is addressed

under the <u>Brecht</u> harmless error standard.  <u>See</u> <u>Albrecht</u>, 485 F.3d at 139 (quoting <u>Brecht</u>, 507 U.S. at 637).  That standard considers whether the cumulative prejudice of identified errors undermined the reliability of the verdict, which requires an assessment of the evidence of guilt at trial.  <u>See</u> <u>Albrecht</u>, 485 F.3d at 139; <u>Fahy</u>, 516 F.3d at 205.

The Court concludes that the supreme court's disposition of this claim did not result in a decision contrary to, or involve an unreasonable application of, clearly established federal law and did not result in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  <u>See</u> 28 U.S.C. § 2254(d).  Accordingly, the Court will deny Sepulveda's tenth ground for relief.

## IV.    CERTIFICATE OF APPEALABIILITY

Pursuant to 28 U.S.C. § 2253(c)(1)(A), an appeal may not be taken from a final order in a proceeding initiated pursuant to 28 U.S.C. § 2254 unless a circuit justice or judge issues a certificate of appealability ("COA").  A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right.  <u>See</u> 28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El</u>, 537 U.S. at 327.  In the instant case, jurists of reason could not disagree with the Court's resolution of Sepulveda's constitutional claims or conclude that the issues presented are adequate to deserve encouragement to proceed further.  Accordingly, the Court will not issue a COA in this case.

## V.      CONCLUSION

For the foregoing reasons, the Court will deny Sepulveda's amended petition for writ of

habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 31) and the Court will not issue a COA.

An appropriate Order follows.